| Jan'y Term, | *Ex parte* William A. Quarrier. | 1866. |
|---|---|---|

# 𝔚𝔥𝔢𝔢𝔩𝔦𝔫𝔤.

## * *Ex parte* WILLIAM A. QUARRIER.

| 2 | 569 |
|---|---|
| 43 | 775 |

### January Term, 1866.

W. A. Q. applied to the circuit court of K. county for admission to practice at its bar as an attorney. He produced papers to show that he was a regularly licensed attorney in K. county, and had been admitted to practice in 1853. He admitted that he had taken the oaths then prescribed for attorneys; that he was a resident and citizen of K. county until 1861; that he voted for the ordinance of secession, and had voluntarily entered the military service of the so-called Confederate States, and that he had borne arms and waged war against the United States of America. He also produced a copy of the amnesty oath which he had taken and subscribed under the proclamation of the chief executive officer of the United States (President Johnson). The circuit court overruled his motion for admission, and he excepted and appealed to this court. HELD:

1. A licensed attorney has as unquestioned a right to be permitted to qualify with a view to practice, by taking the oaths required at the time of his application, as he has to practice after he has qualified.

2. A Virginia license to an attorney, resident in this State at the time of the separation of West Virginia, avails as fully as if granted in the latter State.

3. Q. not having been convicted of treason according to the course of the common law, is not debarred of his right to practice as an attorney, unless the law making power has provided some other procedure.

4. No treason against the State of West Virginia, whose courts are invoked to consider the subject, has been proved or confessed; and treason can only be committed against the State which enacts the law, and by a citizen thereof.

The case is substantially stated in the syllabus, and opinion of the President.

The applicant appeared in his own behalf in this court.

BROWN, J. This is an application of William A. Quarrier, of Kanawha, to be admitted to practice as an at-

---

* This case should have been reported in Vol. 1.

torney in this court, standing in part on the same grounds as the motion of the Hon. C. J. Faulkner, just disposed of; and so far as the cases are the same, the same ruling must apply. But in addition to the circumstances of that, this case presents, in part, another state of facts and other objections raised for the consideration of the court.

The applicant was in complicity with the rebellion from the beginning, surrendered and took the amnesty oath prescribed by President Johnson, and thereby received the executive pardon.

The right of a licensed attorney to be permitted to qualify with a view to practice his profession, upon taking the oaths required by law at the time of his application, is as unquestionable as his right to practice after he has qualified. *Fisher's case*, 6 Leigh, 619.

According to the ruling of this court in *Faulkner's case*, a Virginia license to an attorney resident in this State at the time of the separation, avails as fully as if granted here. It follows, therefore, that to prevent the applicant from qualifying and practising his profession here it ought to be shown, that he had forfeited the right conferred by his license. And to this end it has been urged by the attorney general that the applicant has been guilty of treason. Now, that the citizen who, unmindful of his duty, and forgetful of the obligation of his oath as an attorney, instigates rebellion, joins the public enemy, and voluntarily wages a war of insurrection to subvert the government of his country, commits treason and forfeits his right to life, property, and privileges derived under that government, few will deny. But these consequences, after the restoration of peace, as distinguished from a state of war, only follow on conviction of the crime according to the course of common law, unless the law-making power has provided some other mode of procedure.

It is very true, that by the common law the subject or citizen of one belligerent cannot sue in the courts of the other, and the principle is the same whether the party suing be alien or citizen, if an enemy. But the disability, at least

as respects the alien enemy, is temporary and only lasts while the state of war lasts: *Brandon* vs. *Nesbitt*, 6 D. & E., 23; *Clark* vs. *Morey*, 10 John, 69; *Bagwell* vs. *Babe*, 1 Rand., 272. And it is equally clear on principle, that an attorney in like case would not be allowed to practice any more than a party to sue. But when peace should be restored, the ground of the exclusion, as well in the one case as in the other, would have ceased, and with it the disability, unless the legislature has provided otherwise. The maxim being, "*Cessante ratione legis cessat ipsa lex*"—The reason of the rule ceasing, the rule also ceases.

But it has been urged that the facts confessed were treason, and that treason confessed was felony within the statute, sec. 5, chap. 164, Code of 1860, which provides that "any court before which any attorney has been qualified, on proof being made to it that he has been convicted of felony, may supersede his license." But not every treason is within that statute. Treason to any other government than our own would not answer its requirements. An Irish or Hungarian rebel would hardly be excluded from practising as an attorney here, if otherwise qualified, because of his treason to the British queen or Austrian emperor. Treason is very truly and justly regarded as the highest crime known to the law, but that is only true of treason against the State which enacted the law; for of treason against any other State the law takes no notice, and Sir Walter Scott but expressed the common judgment of mankind when the said that, "treason upon political accounts, though one of the highest crimes that can be committed against a State, does not necessarily infer anything like the detestation which attends offences of much less guilt and danger."

Indeed it must not be forgotten that in this case no treason against the State of West Virginia, whose courts are invoked to consider the subject, has been either proved or confessed, and the only acts stated that could amount to the crime of treason were perpetrated against the United States, and for which the party has been pardoned by that government. Now it would be straining the point too far to hold,

as contended for, that the war being waged against the United States, of which the State of West Virginia was one, was, therefore, waged against her in the sense contemplated in the statute against treason, and that, therefore, the acts in question were treason against the State and felony within the statute. *The People* vs. *Lynch and others*, 11 John., 549. For while it is not intended to deny that the same act might constitute treason against the United States and also against the State, and the traitor be held responsible to each for his treason, respectively, yet, to constitute treason against the State, it is not enough to wage war against the United States generally or collectively, or as component parts of the national Union, but it must be done directly against the State, in particular, by invading her territory, attacking her citizens, subverting her government and laws, or attempting her destruction by force, &c., and that too by a citizen of the State; for none but her citizens owe her allegiance, and are, therefore, bound by that allegiance to protect and defend her against all assaults of her enemies. Others may be enemies, but the citizen *only* may be enemy and traitor also, and the latter no less because he is the former. *Prize cases*, 2 Black. The temporary disability which attached to the applicant on account of his character of enemy ceased when that character terminated, and that was when he submitted to the government and took the oath of amnesty on the terms prescribed by the President. It is true that act could not relieve him from the consequences of treason, if any committed by him against the State, yet as only the citizen can commit that crime it cannot be laid to the applicant's charge on the facts confessed, unless the court should hold the act of February 3rd, 1863, void, which declares that any citizen of the State, who shall thereafter levy war against the United States, &c., shall be considered as having expatriated himself so far as regards this State, and shall thenceforth be deemed no citizen thereof. And if in point of law no citizen of this State, then, in point of law no traitor to the State.

An appeal has been made to the court to exclude attor-

neys, circumstanced as the applicant is, upon the ground of public policy, and the danger of baleful influence in a political light.  But these are considerations better addressed to the legislature than the courts.  Whatever may be the true policy of the law-making power to pursue is a question for that power to determine.  The duty and true policy of the courts to pursue is to expound the law as it is, and if it is not what it ought to be, to leave it to the legislature to change it.  And especially is this the case in a government like our own, where the State constitution has carefully and cautiously distributed the legislative, executive and judicial powers, and restrained their exercise to distinct co-ordinate departments of the government, and prohibited either to invade the dominion of the other.

Since, therefore, no act of the legislature has been found disbarring the applicant, or making it the duty of the court to do so, it is not perceived on what authority the court might interpose and refuse the applicant permission to qualify and practice as an attorney in this court, upon his taking the oaths required by law of all other attorneys. And this view of the case is sustained by the decision of the court of appeals of Kentucky in *Tenny's case*.

The other judges concurred.

MOTION SUSTAINED.