## Court of Appeals.

June, 1902.

# THE PEOPLE v. JOHN MOST.

(171 N. Y. 423.)

REPUBLICATION OF ARTICLE ADVOCATING THE MURDER OF RULERS—PENAL CODE, SEC. 675.

A publication which instigates revolution and murder; which suggests the persons to be murdered through the positions occupied and the duties performed by them; which advises all to discharge their duty to the human race by murdering those who enforce the law; which denounces those who spare the ministers of public justice as guilty of a crime against humanity, and which names poison and dynamite as the agencies to be used to murder and destroy, necessarily endangers the public peace and constitutes a misdemeanor under section 675 of the Penal Code.

2. SAME—CONSTITUTING FREEDOM OF SPEECH.

The constitution does not protect a publisher from the consequences of a crime committed by the act of publication, and places no restraint upon the power of the Legislature to punish the publication of matter which is injurious to society according to the stand of the common law.

APPEAL from an order of the Appellate Division of the Supreme Court in the First Judicial Department, entered April 16, 1902, which affirmed a judgment of the Court of Special Sessions of the city of New York convicting the defendant of a misdemeanor.

The facts, so far as material, are stated in the opinion.

Morris Hillquit, for appellant.

William Travers Jerome, District Attorney (Robert C. Taylor, of counsel), for respondent.

VANN, J.: The defendant was convicted of violating section 675 of the Penal Code, in that on the 7th of September, 1901, at the city of New York, he wilfully and wrongfully

committed an act which seriously endangered the public peace.

He was the publisher of a weekly newspaper called the "Freiheit," and the wrongful act consisted in the publication of an article in that paper advocating and advising revolution and murder. The defendant admitted the publication of the article, but testified that it was written by one Carl Heinzen and first appeared fifty years ago in a paper called the "Pioneer," published in Boston. He further testified that he published the article on the same day that President McKinley was shot, and that as soon as he heard of that event, "thinking it might be taken the wrong way, that some might think that it was published for that occasion," he "tried to get the copies back and take it out of circulation."

The article was very long, but the following extracts will suffice for the purpose of this review. It was entitled "Murder vs. Murder," and the opening sentence is as follows: "As Heinzen said, nearly fifty years ago (this is true even to-day) there are various technical expressions for the important manipulation by which one human being destroys the life of another." Various definitions of murder follow, and it is stated that the purpose of murder is always the same, "the destruction of a life that is hostile or a hindrance." It is then declared in substance that as "the dominant barbarism," meaning constituted authority, punishes murder by murder, "humanity is forced by necessity to use a weapon, to become the murderess of murderers. If murder is permitted to any one person it is also permitted to all, especially to those who practice it for the purpose of destroying the professional murderers or the murderers by the grace of God."

This ends the first paragraph of the article, which continues without quotation marks, or anything to indicate that the remainder was written except for the purpose of publication in the "Freiheit." After a long argument aiming to show that all government is founded on murder the declaration is made: "We have the representative of murder before us in all forms.

There they stand awaiting our judgment and our decision; they tell us with praiseworthy decisiveness, ' We have murdered, we murder and we will murder as long as we can, we will murder in order to rule, just as you must murder in order to become free.' No further dispute on this question, whether murder is an inevitable necessity—we maintain it; no further dispute over the question whether it (murder) is a right—we practice it."

Then follow, at intervals, sentences and paragraphs of which the following are specimens: " Does not the whole world still declare that to be government, which is nothing more than murder dominion ? "

" Humanity, you have lost your conscience or reason. You recognize it, the victor (meaning government) is right, that is to say, murder is right. You can save your conscience as well as your reason if you abolish murder, by turning it against all murderers so as to bring about the fact that right practices murder. Let murder be our study, murder in every form. In this one word lies more humanity than in all our theories."

" The greatest of all follies in the world is the belief that there exists a crime against respots and their myrmidons (meaning public rulers and their officers of justice); they are in human society what the tiger is among animals, to spare them is a crime; as despots permit themselves everything, betrayal, poison, murder, etc., in the same way, all this is to be employed against them. Yes, crime directed against them is not only right, but it is the duty of every one who has an opportunity to commit it, and it would be a glory to him if it was successful."

" The laws of despots are nothing but the dictates of the sword, their property is nothing less than plunder, their punishment is nothing less than murder; no one can become a criminal as far as their ' laws ' are concerned; on their murder heads a revolutionist can only become a liberator of humanity. In all struggles between reaction (meaning government) and

revolution, it goes without saying that reaction is the attacking party, revolution is nothing, more than a necessary defense. Murder as a necessary defense is not only permissible, but it is sometimes a duty toward society when it is directed against a professional murderer."

" We know our enemies, we know them all personally in every place; there is absolutely no more excuse if they were again spared. . . . Let the people execute the judgment. The way of humanity leads over the summit of barbarism. This is just the law of necessity dictated by reaction. We can not go around it as we do not wish to renounce the future. If we wish the design, we must also wish the means; if we wish the life of the peoples, we must wish for the death of their enemies; if we wish for humanity, we must wish for murder."

" We say murder the murderers, save humanity, through blood and iron, poison and dynamite."

Section 675 of the Penal Code provides, among other things, that " a person who wilfully and wrongfully commits any act . . . which seriously disturbs or endangers the public peace . . . for which no other punishment is expressly prescribed by this Code, is guilty of a misdemeanor."

Two questions are presented for decision: 1st, did the publication of the article in question constitute a crime under section 675 of the Penal Code? 2nd, did the conviction of the defendant violate the constitutional guaranty of freedom of the press?

So far as the meaning, intent and effect of the article involve a question of fact, we are concluded by the concurrent action of the courts below, but the simple interpretation of the paper, without regard to extraneous facts, presents a question of law for us to decide. While the application intended, or any hidden or ambiguous meaning, which may be discovered by reading between the lines, or by the aid of surrounding circumstances, may involve a question of fact, the obvious and natural meaning is to be determined as a question of law.

If the article advocates revolution and murder, it is not important that it should have been written by the defendant, but it is sufficient if he adopted the words of another to express his wishes. If he intended to convey the idea that the entire article was written by Heinzen, he nevertheless adopted it by the statement in parenthesis, which was his own, that " this is true even to-day." He thus indorsed the sentiments expressed and ratified the advice given. Moreover the tone and tenor of his statements, arguments and exhortations apply to the present time and call for action on the part of his readers without delay. The article was published without quotation marks and without comment, criticism, or dissent, and a fair reading thereof leaves the impression upon the mind that only the opening sentence or sentences were written by Heinzen and that the remainder was the work of the publisher. This conclusion is strengthened by the internal evidence that the writing was of recent origin, such as the use of the word " dynamite," which occurs twice, yet that word was not in use fifty years ago when Heinzen is alleged to have written his dissertation on murder. (Title Dynamite, Worcester Dict., ed. 1859; Webster, ed. 1864; Encyc. Brit., ed. 1878; Alden's Cyc.; Murray's New Oxford Dict.; Harper's Book of Facts; Townsend's Manual of Dates.)

The object of the article, as we interpret it, was not to criticize or discuss public officers, or public affairs, but to denounce government as " murder dominion " and to advocate the murder of those who govern. While it was written with special reference to rulers who wear crowns, it recommends the murder of all rulers, without exception, express or implied. The argument is that as the enforcement of law is murder, the assassination of those who enforce the law is not only justifiable, but to spare them would be a crime. It calls the constituted authorities murderers, and urges its readers to " murder the murderers." Its tendency is to incite and stimulate the destruction of government and its agents " through blood and

iron, poison and dynamite." It teaches the doctrine that government is founded on murder, that all rulers are enemies of the human race and that " crime directed against them is not only right, but it is the duty of every one who has an opportunity to commit it and it would be a glory to him if it was successful." The publisher exhorts his readers to " let murder be our study, murder in every form," when directed against those who preserve order and enforce law. Government is described as " reaction " and not only is the murder of those having authority upheld and urged, but revolution against government as " the attacking party " is proclaimed as " nothing more than necessary defense."

Further analysis is unnecessary. While the publication was not addressed to any one in particular, it was impliedly addressed to the readers of the " Freiheit; " and while it did not urge the murder of any particular individual, it advocated the murder of all rulers and the destruction of all government.

A publication which instigates revolution and murder; which suggests the persons to be murdered through the positions occupied and the duties performed by them; which advises all to discharge their duty to the human race by murdering those who enforce the law; which denounces those who spare the ministers of public justice, as guilty of a crime against humanity and which names poison and dynamite as the agencies to be used to murder and destroy, necessarily endangers the public peace.

A breach of the peace is an offense well known to the common law. It is a disturbance of public order by an act of violence, or by any act likely to produce violence, or which, by causing consternation and alarm, disturbs the peace and quiet of the community. (Barb. Cr. L. 219; Archibald Cr. Pr. 91; Bishop Cr. L., sec. 533; Clark & Marshall, Law of Crimes, 983; McLean Cr. L., sec. 1012.) It may be committed by written words, as a libel has been indictable for time out of mind because it tends to produce violence; or even by

spoken words, provided they tend to provoke immediate violence.

The defendant was not charged with an actual breach of the peace, which is a distinct offense both at common law and by statute, but with an act alleged to seriously endanger it. The public peace is in danger when a breach thereof is likely to occur in the ordinary course of events. The publication of the defendant manifestly tended toward this result, for he held forth murder as a duty and exhorted his readers to practice it upon their rulers. What would be more apt to alarm the people and disturb the peace of society ? If the words used by him would not, what words could ? As we said, when the defendant was before us on another appeal involving a somewhat similar crime, " No one can foresee the consequences which may result from language such as was used on this occasion. . . . " (People v. Most, 128 N. Y. 108, 115.) He not only defended but advised the most serious crime known to the law. His language was an invitation to murder. He who counsels murder, becomes a murderer if his advice is taken. Such advice given to the 3,000 subscribers and to more than that number of readers of the defendant's paper, might naturally, as the history of the times shows, result in violence and murder. The courts cannot shut their eyes to the fact that there are elements in our population, small in number but reckless and aggressive, who are ready to act on such advice and to become the assassins of those whom the people have placed in authority. The public peace is seriously endangered when arguments are made and advice given which may naturally result even in a simple breach of the peace, and when the arguments and advice are of such an alarming and dangerous character as to naturally lead to the assassination of public officers, punishment and repression are essential to the welfare of society and the safety of the State. We think that the act of the defendant was a violation of the Penal Code and constituted a misdemeanor under the section cited.

Vol. XVI—36

The constitution of our State provides that "Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press." (Art. I, sec. 8.)

While the right to publish is thus sanctioned and secured, the abuse of that right is excepted from the protection of the constitution, and authority to provide for and punish such abuse is left to the Legislature. The punishment of those who publish articles which tend to corrupt morals, induce crime or destroy organized society, is essential to the security of freedom and the stability of the State. While all the agencies of government, executive, legislative and judicial, cannot abridge the freedom of the press, the Legislature may control and the courts may punish the licentiousness of the press. "The liberty of the press," as Chancellor KENT declared in a celebrated case, "consists in the right to publish, with impunity, truth, with good motives, and for justifiable ends, whether it respects governments, magistracy or individuals." (People v. Croswell, 3 Johns. Cas. 336, 393.) Mr. Justice STORY defined the phrase to mean "that every man shall have a right to speak, write and print his opinions upon any subject whatsoever, without any prior restraint, so always, that he does not injure any other person in his rights, person, property or reputation; and so always, that he does not thereby disturb the public peace, or attempt to subvert the government." (Story's Commentaries on the Constitution, sec. 1874.)

The constitution does not protect a publisher from the consequences of a crime committed by the act of publication. It does not shield a printed attack on private character, for the same section from which the above quotation is taken expressly sanctions criminal prosecution for libel. It does not permit the advertisement of lotteries, for the next section prohibits lotteries and the sale of lottery tickets. It does not permit the publication of blasphemous or obscene articles, as the author-

ities uniformly hold.    (People v. Ruggles, 8 Johns. 290, 297; People v. Muller, 96 N. Y. 408; In re Rapier, 143 U. S. 110.) It places no restraint upon the power of the Legislature to punish the publication of matter which is injurious to society according to the standard of the common law.    It does not deprive the State of the primary right of self-preservation.    It does not sanction unbridled license, nor authorize the publication of articles prompting the commission of murder or the overthrow of government by force.    All courts and commentators contrast the liberty of the press with its licentiousness, and condemn as not sanctioned by the constitution of any State, appeals designed to destroy the reputation of the citizen, the peace of society or the existence of the government.    (Story on the Const., sec. 1878; Cooley on Constitutional Limitations, 518; Ordronaux on Constitutional Legislation, 237; Tiedeman on Police Powers, sec. 81.)    We think that no constitutional right of the defendant was violated by his conviction and that the judgment pronounced against him was rendered in accordance with law.

The judgment should be affirmed.

PARKER, Ch. J., GRAY, HAIGHT, MARTIN, CULLEN and WERNER, JJ., concur.

Judgment affirmed.