# GILBERT *v.* STATE OF MINNESOTA.

ERROR TO THE SUPREME COURT OF THE STATE OF MINNESOTA.

No. 79. Argued November 10, 1920.—Decided December 13, 1920.

1. The law of Minnesota declaring it a misdemeanor for any person to teach or advocate by any written or printed matter or by oral speech that citizens of the State should not aid or assist the United States in prosecuting or carrying on war with the public enemies of the United States, is valid under the Federal Constitution. P. 327.

2. Such an enactment may be upheld both as a legitimate measure of

coöperation by the State with the United States, not in conflict with
the federal war power, p. 328; and also as an exercise of the police
power to preserve the peace of the State. P. 331. *Halter* v. *Nebraska*,
205 U. S. 34; *Presser* v. *Illinois*, 116 U. S. 252.

3. The right of free speech does not cover false and malicious misrepre-
sentations of the objects and motives of this country in entering upon
a war, made in a public speech for the purpose of discouraging the
recruiting of troops, while the war is flagrant and armies are being
raised. P. 332.

141 Minnesota, 263, affirmed.


THE case is stated in the opinion.


*Mr. George Nordlin* and *Mr. Frederic A. Pike* for plaintiff
in error.


*Mr. James E. Markham,* Assistant Attorney General of
the State of Minnesota, with whom *Mr. Clifford L. Hilton,*
Attorney General of the State of Minnesota, was on the
briefs, for defendant in error.


MR. JUSTICE McKENNA delivered the opinion of the
court.


A statute of Minnesota makes it unlawful "to interfere
with or discourage the enlistment of men in the military
or naval forces of the United States or of the State of
Minnesota."

Its second and third sections are as follows:

"Sec. 2. Speaking by word of mouth against enlist-
ment unlawful.—It shall be unlawful for any person in
any public place, or at any meeting where more than five
persons are assembled, to advocate or teach by word of
mouth or otherwise that men should not enlist in the mili-
tary or naval forces of the United States or the state of
Minnesota.

"Sec. 3. Teaching or advocating by written or printed
matters against enlistment unlawful.—It shall be un-

lawful for any person to teach or advocate by any written or printed matter whatsoever, or by oral speech, that the citizens of this state should not aid or assist the United States in prosecuting or carrying on war with the public enemies of the United States"

Section 4 defines a citizen to be "any person within the confines of the state," and § 5 declares violations of the act to be gross misdemeanors and punishable by fine and imprisonment.

The indictment charged that Gilbert at a time and place designated in the State, and under the conditions prohibited by § 2, the United States being then and there at war with the Kingdom and Imperial Government of Germany, used the following language:

"We are going over to Europe to make the world safe for democracy, but I tell you we had better make America safe for democracy first. You say, what is the matter with our democracy. I tell you what is the matter with it: Have you had anything to say as to who should be president? Have you had anything to say as to who should be Governor of this state? Have you had anything to say as to whether we would go into this war? You know you have not. If this is such a great democracy, for Heaven's sake why should we not vote on conscription of men. We were stampeded into this war by newspaper rot to pull England's chestnuts out of the fire for her. I tell you if they conscripted wealth like they have conscripted men, this war would not last over forty-eight hours. . . ."

A demurrer to the indictment was overruled, and Gilbert was tried and convicted. The judgment was that he pay a fine of $500 and be imprisoned in the county jail of the County of Goodhue for one year, and pay the costs of the prosecution. The judgment was affirmed by the Supreme Court of the State.

The statute, it is contended, is repugnant to the Constitution of the United States in that, (1) "all power of legis-

lation regarding the subject matter contained in the stat-
ute is conferred upon Congress and withheld from the
States." (2) And that the statute is obnoxious to the
"inherent right of free speech respecting the concerns,
activities and interests of the United States of America
and its Government."

We shall consider the objections in their order. It is said
in support of the exclusive power in Congress, that Con-
gress alone can under the Constitution "'provide for the
common defence and general welfare of the United States,'
'declare war,' 'raise and support armies,' 'make rules
for the government and regulation of the land and naval
forces.'" To these affirmative delegations of power to
Congress, there is added, it is said, a prohibition to the
States to "engage in war, unless actually invaded, or in
such imminent danger as will not admit of delay." And,
"that the State of Minnesota is not a party to the war'
now [then] being waged. And if it has not engaged in any
war, and until it does so engage, legislation such as a bel-
ligerent sovereign might enact, is beyond its province."
These specific grounds of objection to the statute are
attempted to be reinforced by analogy to the power of
Congress over interstate commerce to the exclusion of
the interference of the States.

The bases of the objections seem to be that plaintiff in
error had an accountability as a citizen of the United
States different from that which he had as a citizen of the
State, and that, therefore, he was not subject to the power
or jurisdiction of the State exercised in the act under
review. Manifestly, to support the contention something
more is necessary than the letter of the cited constitutional
provisions. The broader proposition must be established
that a State has no interest or concern in the United States
or its armies or power of protecting them from public
enemies.

Undoubtedly, the United States can declare war and it,

not the States, has the power to raise and maintain armies. But there are other considerations. The United States is composed of the States, the States are constituted of the citizens of the United States, who also are citizens of the States, and it is from these citizens that armies are raised and wars waged, and whether to victory and its benefits, or to defeat and its calamities, the States as well as the United States are intimately concerned. And whether to victory or defeat depends upon their morale, the spirit and determination that animates them—whether it is repellent and adverse or eager and militant; and to maintain it eager and militant against attempts at its debasement in aid of the enemies of the United States, is a service of patriotism; and from the contention that it encroaches upon or usurps any power of Congress, there is an instinctive and immediate revolt. Cold and technical reasoning in its minute consideration may indeed insist on a separation of the sovereignties and resistance in each to any co-operation from the other, but there is opposing demonstration in the fact that this country is one composed of many and must on occasions be animated as one and that the constituted and constituting sovereignties must have power of coöperation against the enemies of all. Of such instance, we think, is the statute of Minnesota and it goes no farther. It, therefore, has none of the character of the illustrations adduced against it, nor the possibility of conflict of powers which they condemn. This was the view of the Supreme Court of the State, and the court expressed it with detail and force of reasoning. The same view of the statute was expressed in *State* v. *Holm,* 139 Minnesota, 267, where, after a full discussion, the contention was rejected that the Espionage Law of June 15, 1917, abrogated or superseded the statute, the court declaring that the fact that the citizens of the State are also citizens of the United States and owe a duty to the Nation, does not absolve them from duty to the State nor preclude a State from

enforcing such duty. "The same act," it was said, "may be an offense or transgression of the laws of both" Nation and State, and both may punish it without a conflict of their sovereignties. Numerous cases were cited commencing with *Moore* v. *Illinois*, 14 How. 13, and terminating with *Halter* v. *Nebraska*, 205 U. S. 34.[1]

The latter case is especially pertinent in its sentiment and reasoning. It sustained a statute of Nebraska directed against the debasement of the National flag to trade uses against the contention that the flag being the National emblem was subject only to the control of the National power. In sustaining the statute it was recognized that in a degradation of the flag there is a degradation of all of which it is the symbol, that is, "the National power and National honor" and what they represent and have in trust. To maintain and reverence these, to "encourage patriotism and love of country among its people," may be affirmed, it was said, to be a duty that rests upon each State, and that "when, by its legislation, the State encourages a feeling of patriotism towards the Nation, it necessarily encourages a like feeling towards the State."

And so with the statute of Minnesota. An army is an instrument of government, a necessity of its power and honor, and it may be, of its security. An army, of course, can only be raised and directed by Congress, in neither has

---

[1] In *Gustafson* v. *Rhinow*, 144 Minnesota, 415, the Supreme Court of Minnesota sustained a law of the State giving to soldiers who served in the war against Germany $15 for each month or fraction of a month of service, against an attack that the soldiers were soldiers of the United States. The court expressed the concern and interest of the State as follows: "It is true that the Federal government alone has power to declare war, but having done so, the government and people of Minnesota became bound to defend and support the national government. While the states of the nation are sovereign in a certain field, they are also members of the family of states constituting the national organization."

the State power, but it has power to regulate the conduct of its citizens and to restrain the exertion of baleful influences against the promptings of patriotic duty to the detriment of the welfare of the Nation and State. To do so is not to usurp a National power, it is only to render a service to its people, as Nebraska rendered a service to its people when it inhibited the debasement of the flag.

We concur, therefore, in the final conclusion of the court, that the State is not inhibited from making "the national purposes its own purposes to the extent of exerting its police power to prevent its own citizens from obstructing the accomplishment of such purposes."

The statute, indeed, may be supported as a simple exertion of the police power to preserve the peace of the State. As counsel for the State say, "The act under consideration does not relate to the raising of armies for the national defense, nor to rules and regulations for the government of those under arms. It is simply a local police measure, aimed to suppress a species of seditious speech which the legislature of the State has found objectionable. If the legislature has otherwise power to prohibit utterances of the character of those here complained of, the fact that such suppression has some contributory effect on the federal function of raising armies is quite beside the question." And the State knew the conditions which existed and could have a solicitude for the public peace, and this record justifies it. Gilbert's remarks were made in a public meeting. They were resented by his auditors. There were protesting interruptions, also accusations and threats against him, disorder and intimations of violence. And such is not an uncommon experience. On such occasions feeling usually runs high and is impetuous; there is a prompting to violence and when violence is once yielded to, before it can be quelled, tragedies may be enacted. To preclude such result or a

danger of it is a proper exercise of the power of the State. *Presser* v. *Illinois*, 116 U. S. 252, 267.

The next contention is, that the statute is violative of the right of free speech, and therefore void. It is asserted that the right of free speech is a natural and inherent right, and that it, and the freedom of the press, were "regarded as among the most sacred and vital possessed by mankind, when this nation was born, when its constitution was framed and adopted." And the contention seems necessary for the plaintiff in error to support. But without so deciding or considering the freedom asserted as guaranteed or secured either by the Constitution of the United States or by the constitution of the State, we pass immediately to the contention and for the purposes of this case may concede it, that is, concede that the asserted freedom is natural and inherent, but it is not absolute, it is subject to restriction and limitation. And this we have decided. In *Schenck* v. *United States*, 249 U. S. 47, 52, we distinguished times and occasions and said that "the most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre and causing a panic"; and in *Frohwerk* v. *United States*, 249 U. S. 204, 206, we said "that the First Amendment while prohibiting legislation against free speech as such cannot have been, and obviously was not, intended to give immunity for every possible use of language." See also, *Debs* v. *United States*, 249 U. S. 211; *Abrams* v. *United States*, 250 U. S. 616. In *Schaefer* v. *United States*, 251 U. S. 466, commenting on those cases and their contentions it was said that the curious spectacle was presented of the Constitution of the United States being invoked to justify the activities of anarchy or of the enemies of the United States, and by a strange perversion of its precepts it was adduced against itself. And we did more than reject the contention, we forestalled all repetitions of it, and the contention in the case at bar is a repetition of it. It is a direct assault upon

the statute of Minnesota, and a direct assertion in spite of
the prohibition of the statute that one can by speech,
teach or advocate that the citizens of the State should
not aid or assist "the United States in prosecuting or
carrying on war with the public enemies of the United
States," and be protected by the Constitution of the
United States.

The same conditions existed as in the cited cases, that is,
a condition of war and its emergency existed, and there
was explicit limitation to § 3 in the charge of the trial court
to the jury. The court read §§ 2 and 3 of the statute to
the jury and said, "I take it from the reading of the whole
indictment that it is prosecuted under Section 3, which I
have just read to you."

Gilbert's speech had the purpose they denounce. The
Nation was at war with Germany, armies were recruiting,
and the speech was the discouragement of that—its pur-
pose was necessarily the discouragement of that. It was
not an advocacy of policies or a censure of actions that a
citizen had the right to make. The war was flagrant; it
had been declared by the power constituted by the Con-
stitution to declare it, and in the manner provided for by
the Constitution. It was not declared in aggression, but
in defense, in defense of our national honor, in vindication
of the "most sacred rights of our Nation and our people."[1]

This was known to Gilbert for he was informed in affairs
and the operations of the Government, and every word
that he uttered in denunciation of the war was false, was
deliberate misrepresentation of the motives which impelled
it, and the objects for which it was prosecuted. He could
have had no purpose other than that of which he was
charged. It would be a travesty on the constitutional
privilege he invokes to assign him its protection.

*Judgment affirmed.*

[1]Words of President Wilson in his War Message to Congress, April 2,
1917.

MR. JUSTICE HOLMES concurs in the result.

THE CHIEF JUSTICE, being of the opinion that the subject-matter is within the exclusive legislative power of Congress, when exerted, and that the action of Congress has occupied the whole field, therefore dissents.

MR. JUSTICE BRANDEIS, dissenting.

Joseph Gilbert, manager of the organization department of the Non-partisan League, was sentenced to fine and imprisonment for speaking on August 18, 1917, at a public meeting of the League, words held to be prohibited by c. 463 of the laws of Minnesota, approved April 20, 1917. Gilbert was a citizen of the United States, and apparently of a State other than Minnesota. He claimed seasonably that the statute violated rights guaranteed to him by the Federal Constitution. This claim has been denied; and, in my opinion, erroneously.

The Minnesota statute was enacted during the World War; but it is not a war measure. The statute is said to have been enacted by the State under its police power to preserve the peace;—but it is in fact an act to prevent teaching that the abolition of war is possible. Unlike the Federal Espionage Act of June 15, 1917, c. 30, 40 Stat. 217, 219, it applies equally whether the United States is at peace or at war. It abridges freedom of speech and of the press, not in a particular emergency, in order to avert a clear and present danger, but under all circumstances. The restriction imposed relates to the teaching of the doctrine of pacifism and the legislature in effect proscribes it for all time. The statute does not in terms prohibit the teaching of the doctrine. Its prohibition is more specific and is directed against the teaching of certain applications of it. This specification operates, as will be seen, rather to extend, than to limit the scope of the prohibition.

Sections 1 and 2 prohibit teaching or advocating by printed matter, writing or word of mouth, that men should not enlist in the military or naval forces of the United States. The prohibition is made to apply whatever the motive, the intention, or the purpose of him who teaches. It applies alike to the preacher in the pulpit, the professor at the university, the speaker at a political meeting, the lecturer at a society or club gathering. Whatever the nature of the meeting and whether it be public or private, the prohibition is absolute, if five persons are assembled. The reason given by the speaker for advising against enlistment is immaterial. Young men considering whether they should enter these services as a means of earning a livelihood or as a career, may not be told that, in the opinion of the speaker, they can serve their country and themselves better by entering the civil service of State or Nation, or by studying for one of the professions, or by engaging in the transportation service, or in farming or in business, or by becoming a workman in some productive industry. Although conditions may exist in the Army or the Navy which are undermining efficiency, which tend to demoralize those who enter the service and would render futile their best efforts, the State forbids citizens of the United States to advocate that men should not enlist until existing abuses or defects are remedied. The prohibition imposed by the Minnesota statute has no relation to existing needs or desires of the Government. It applies although recruiting is neither in process nor in contemplation. For the statute aims to prevent not acts but beliefs. The prohibition imposed by § 3 is even more far-reaching than that provided in §§ 1 and 2. Section 3 makes it punishable to teach in any place a single person that a citizen should not aid in carrying on a war, no matter what the relation of the parties may be. Thus the statute invades the privacy and freedom of the home. Father and mother may not follow the promptings of religious belief,

of conscience or of conviction, and teach son or daughter the doctrine of pacifism. If they do any police officer may summarily arrest them.

That such a law is inconsistent with the conceptions of liberty hitherto prevailing seems clear. But it is said that the guaranty against abridging freedom of speech contained in the First Amendment of the Federal Constitution applies only to federal action; that the legislation here complained of is that of a State; that the validity of the statute has been sustained by its highest court as a police measure; that the matter is one of state concern; and that, consequently this court cannot interfere. But the matter is not one merely of state concern. The state law affects directly the functions of the Federal Government. It affects rights, privileges and immunities of one who is a citizen of the United States; and it deprives him of an important part of his liberty. These are rights which are guaranteed protection by the Federal Constitution; and they are invaded by the statute in question.

Congress has the exclusive power to legislate concerning the Army and the Navy of the United States, and to determine, among other things, the conditions of enlistment. It has likewise exclusive power to declare war, to determine to what extent citizens shall aid in its prosecution and how effective aid may best be secured. Congress, which has power to raise an army and naval forces by conscription when public safety demands, may, to avert a clear and present danger, prohibit interference by persuasion with the process of either compulsory or voluntary enlistment. As an incident of its power to declare war it may, when the public safety demands, require from every citizen full support, and may, to avert a clear and present danger, prohibit interference by persuasion with the giving of such support. But Congress might conclude that the most effective Army or Navy would be one composed wholly of men who had enlisted with full appreciation of

the limitations and obligations which the service imposes, and in the face of efforts to discourage their doing so.[1] It might conclude that the most effective Army would be one composed exclusively of men who are firmly convinced that war is sometimes necessary if honor is to be preserved, and also that the particular war in which they are engaged is a just one. Congress, legislating for a people justly proud of liberties theretofore enjoyed and suspicious or resentful of any interference with them, might conclude that even in times of grave danger, the most effective means of securing support from the great body of citizens is to accord to all full freedom to criticise the acts and administration of their country; although such freedom may be used by a few to urge upon their fellow-citizens not to aid the Government in carrying on a war, which reason or faith tells them is wrong and will, therefore, bring misery upon their country.

The right to speak freely concerning functions of the Federal Government is a privilege or immunity of every citizen of the United States which, even before the adoption of the Fourteenth Amendment, a State was powerless to curtail. It was held in *Crandall* v. *Nevada,* 6 Wall. 35, 44, that the United States has the power to call to the seat of government or elsewhere any citizen to aid it in the conduct of public affairs; that every citizen has the correlative right to go there or anywhere in the pursuit of public or private business; and that "no power can exist in a State to obstruct this right which would not enable it to defeat the purpose for which the government was established." The right of a citizen of the United States to take part, for his own or the country's benefit, in the making of federal laws and in the conduct of the Government, necessarily includes the right to speak or write about them; to endeavor to make his own opinion concerning laws existing

---

[1] See General John A. Logan, "The Volunteer Soldier of America," pp. 89–91; Col. F. N. Maude in the Contemporary Review, v. 189, p. 37.

or contemplated prevail; and, to this end, to teach the truth as he sees it. Were this not so "the right of the people peaceably to assemble for the purpose of petitioning Congress for a redress of grievances, or for any thing else connected with the powers or duties of the national government" would be a right totally without substance. See *United States* v. *Cruikshank,* 92 U. S. 542, 552; *Slaughter-House Cases*, 16 Wall. 36, 79. Full and free exercise of this right by the citizen is ordinarily also his duty; for its exercise is more important to the Nation than it is to himself. Like the course of the heavenly bodies, harmony in national life is a resultant of the struggle between contending forces. In frank expression of conflicting opinion lies the greatest promise of wisdom in governmental action; and in suppression lies ordinarily the greatest peril. There are times when those charged with the responsibility of Government, faced with clear and present danger, may conclude that suppression of divergent opinion is imperative; because the emergency does not permit reliance upon the slower conquest of error by truth. And in such emergencies the power to suppress exists. But the responsibility for the maintenance of the Army and Navy, for the conduct of war and for the preservation of government, both state and federal, from "malice domestic and foreign levy" rests upon Congress. It is true that the States have the power of self-preservation inherent in any government to suppress insurrection and repel invasion; and to that end they may maintain such a force of militia as Congress may prescribe and arm. *Houston* v. *Moore*, 5 Wheat. 1. But the duty of preserving the state governments falls ultimately upon the Federal Government, *Luther* v. *Borden*, 7 How. 1, 77; *Prize Cases*, 2 Black. 635, 668; *Texas* v. *White*, 7 Wall. 700, 727. And the superior responsibility carries with it the superior right. The States act only under the express direction of Congress. See National Defence Act, June 3, 1916, c. 134, 39 Stat.

166; Selective Service Act, May 18, 1917, c. 15, 40 Stat. 76. The fact that they may stimulate and encourage recruiting, just as they may stimulate and encourage interstate commerce, *Monongahela Navigation Co.* v. *United States*, 148 U. S. 312, 329, does not give them the power by police regulations or otherwise to exceed the authority expressly granted to them by the Federal Government. See *Kurtz* v. *Moffitt*, 115 U. S. 487; *Prigg* v. *Pennsylvania*, 16 Pet. 539. Congress, being charged with responsibility for those functions of Government, must determine whether a paramount interest of the Nation demands that free discussion in relation to them should be curtailed. No State may trench upon its province.

Prior to the passage of the Minnesota statute it had been the established policy of the United States, departed from only once in the life of the Nation,[1] to raise its military and naval forces in times of war as in peace exclusively by voluntary enlistment. Service was deemed a privilege of Americans, not a duty exacted by law. Specific provision had been made to ensure that enlistment should be the result of free, informed and deliberate choice.[2] The law of the United States left an American as

---

[1] Act of March 3, 1863, c. 75, 12 Stat. 731.

[2] Recruiting officers were required to explain to every man before he signed the enlistment paper the nature of the service, the length of the term, the amount of pay, clothing, rations and other allowances to which a soldier is entitled by law; and to read and explain to the applicant many of the Articles of War before administering to him the oath of enlistment. U. S. Army Regulations, 1913, paragraphs 854, 856.

The following is contained in the instructions sent to all officers and men assigned to recruiting duty:

"All progress and success rests fundamentally on truth. Hence never resort to indirection or misrepresentation or suppression of part of the facts in order to push a wavering case over the line. Recruits signed up on misrepresented facts or partial information do not make good soldiers. They resent being fooled just as you would, and will never yield their full value to a Government whose agents obtained their services in a way not fully square. Therefore tell your prospect anything he

free to advise his fellows not to enter the Army or the Navy as he was free to recommend their enlistment. The Government had exacted from American citizens no service except the prompt payment of taxes. Although war had been declared such was still the policy and the law of the United States when Minnesota enacted the statute here in question.

The Minnesota statute was, when enacted, inconsistent with the law of the United States, because at that time Congress still permitted free discussion of these governmental functions. Later, and before Gilbert spoke the words complained of, the Federal Espionage Law was enacted, but the Minnesota statute was also inconsistent with it. The federal act did not prohibit the teaching of any doctrine; it prohibited only certain tangible obstructions to the conduct of the existing war with the German Empire committed with criminal intent. It was so understood and administered by the Department of Justice.[1] Under the Minnesota law, teaching or advice that men

---

wants to know about the Army. If the real facts are not strong enough to win him, you don't want him anyway." Recruiters Handbook, United States Army, p. 16.

[1] "The general policy of the Attorney General (Mr. Gregory) toward free speech has been well understood and adhered to by his subordinates with a good deal of consistency. From the outset, recognizing that free expression of public opinion is the life of the nation, we have endeavored to impress on our subordinates the necessity of keeping within the limits of policy established by Congress and bearing in mind at all times the constitutional guarantees. Repeatedly their attention has been called to the fact that expression of private or public opinion relating to matters of governmental policy or of political character must not be confused with wilful attempts to interfere with our conduct of the war. At all times we have had before us the dangers which follow attempts to restrain public discussion and so far as instructions issued by the Attorney General have been concerned, they have consistently and at all times emphasized this general policy." John Lord O'Brian, "Civil Liberty in War Time," Report of New York State Bar Association, vol. 42, p. 308.

should not enlist is made punishable although the jury should find (1) that the teaching or advocacy proved wholly futile and no obstruction resulted; (2) that there was no intent to obstruct; and the court, taking judicial notice of facts, should rule (3) that, when the words were written or spoken, the United States was at peace with all the world. That this conflict was not merely a technical one but a cause of real embarrassment and danger to the Federal Government, we learn from one of the officials entrusted with the administration of the Espionage Act:

"In the State of Minnesota because of what was claimed to be either inadequate federal law or inadequate federal administration, state laws of a sweeping character were passed and enforced with severity. Whether justified or not in adopting this policy of repression, the result of its adoption increased discontent and the most serious cases of alleged interference with civil liberty were reported to the federal government from that state." [1]

In *Johnson* v. *Maryland, ante,* 51, this court held that the power of Congress to establish post roads precluded the State from requiring of a post-office employee using the state highway in the transportation of mail the customary evidence of competency to drive a motor truck, although the danger to public safety was obvious and it did not appear that the Federal Government had undertaken to deal with the matter by statute or regulation. The prohibition of state action rests, as the court pointed out there, "not upon any consideration of degree but upon the entire absence of power on the part of the States to touch . . . the instrumentalities of the United States." As exclusive power over enlistments in the Army and the Navy of the United States and the responsibility for the conduct of war is vested by the Federal Constitution in Congress,

---

[1] Report of New York Bar Association, vol. 42, p. 296.

legislation by a State on this subject is necessarily void unless authorized by Congress. It is so when Congress makes no regulation, because by omitting to make regulations Congress signifies its intention that, in this respect, the action of the citizen shall be untrammelled. This would be true, even if the subject in question were one over which Congress and the States have concurrent power. For where Congress has occupied a field theretofore open also to state legislation, it necessarily excludes all such. *Southern Ry. Co.* v. *Reid,* 222 U. S. 424; *Chicago, Rock Island & Pacific Ry. Co.* v. *Hardwick Farmers Elevator Co.,* 226 U. S. 426. Here Congress not only had exclusive power to act on the subject; it had exercised that power directly by the Espionage Law before Gilbert spoke the words for which he was sentenced. The provisions of the Minnesota statute and its title preclude a contention that its purpose was to prevent breaches of the peace. Compare *Ex parte Meckel,* 220 S. W. Rep. (Tex.) 81. But neither the fact that it was a police regulation, *New York Central R. R. Co.* v. *Winfield,* 244 U. S. 147, nor the fact that it was legislation in aid of congressional action would, if true, save the statute. For "when the United States has exercised its exclusive powers . . . so far as to take possession of the field, the States can no more supplement its requirements than they can annul them." *Pennsylvania R. R. Co.* v. *Public Service Commission,* 250 U. S. 566, 569; *Northern Pacific Ry. Co.* v. *Washington,* 222 U. S. 370. The exclusiveness of the power of the Federal Government with which this state legislation interferes springs from the very roots of political sovereignty. The States may not punish treason against the United States, *People* v. *Lynch,* 11 Johns. (N. Y.) 549; *Ex parte Quarrier,* 2 W. Va. 569; although indirectly acts of treason may affect them vitally. No more may they arrogate to themselves authority to punish the teaching of pacifism which the legislature of Minnesota appears

to have put into that category. Compare *Schaefer* v. *United States*, 251 U. S. 466, 494, note.

As the Minnesota statute is in my opinion invalid because it interferes with federal functions and with the right of a citizen of the United States to discuss them, I see no occasion to consider whether it violates also the Fourteenth Amendment. But I have difficulty in believing that the liberty guaranteed by the Constitution, which has been held to protect against state denial the right of an employer to discriminate against a workman because he is a member of a trade union, *Coppage* v. *Kansas*, 236 U. S. 1, the right of a business man to conduct a private employment agency, *Adams* v. *Tanner*, 244 U. S. 590, or to contract outside the State for insurance of his property, *Allgeyer* v. *Louisiana*, 165 U. S. 578, 589, although the legislature deems it inimical to the public welfare, does not include liberty to teach, either in the privacy of the home or publicly, the doctrine of pacifism; so long, at least, as Congress has not declared that the public safety demands its suppression. I cannot believe that the liberty guaranteed by the Fourteenth Amendment includes only liberty to acquire and to enjoy property.