173 So. 626

## BARTON v. CITY OF BESSEMER.
### 6 Div. 67.

Supreme Court of Alabama.
March 18, 1937.

Geo. W. Bains, of Bessemer, for petitioner.

Harvey M. Emerson, of Birmingham, opposed.

KNIGHT, Justice.

This cause is before this court on petition by the City of Bessemer for a writ of certiorari to the Court of Appeals, to review and revise the opinion and judgment of that court in the case of Jack Barton v. City of Bessemer, 27 Ala.App. 413, 173 So. 621.

It appears that the said Jack Barton was tried and convicted for a violation of an ordinance adopted by the City of Bessemer which is in the following words:

"Section One. That it shall be unlawful to print, publish, edit, issue, or knowingly circulate, sell, distribute or publicly display any book, paper, document, or written or printed matter in any form advocating, advising, or teaching the doctrine that organized government should be overthrown by force, violence or any unlawful means, or have in possession any such book, paper, document or written or printed matter in any form for the purpose or with the intention of distribution, sale, circulation or display thereof, within the City of Bessemer or the police jurisdiction thereof.

"Section Two. That any person violating this ordinance shall be deemed guilty of a misdemeanor and shall be fined not less than $1.00 nor more than $100.00, and in addition to the fine herein provided for may be sentenced to hard labor for the city for not exceeding one hundred eighty (180) days."

While confined by the City of Bessemer under this conviction, a writ of habeas corpus was applied for by petitioner to secure his release. In this petition it is charged that the confinement was illegal, in that the ordinance under which the said defendant was tried and convicted was unconstitutional and void.

Other grounds to support the petition, and relied upon to show that the imprisonment, or restraint, was illegal, and warranted the discharge of the defendant, were assigned, but the Court of Appeals, in its opinion now under review, did not pass upon such other matters, but confined its ruling to a decision upon the constitutionality of the ordinance in question. Hence the constitutionality vel non of the ordinance is the only question to be now and here determined.

We entertain no doubt but that the petitioner has invoked the proper remedy, if the ordinance, under which he was convicted and imprisoned, was unconstitutional and void. In such circumstances, the court would have no jurisdiction, and the arrest, trial, and conviction of the defendant under the void ordinance would be a nullity, and the petitioner would be entitled to his discharge on habeas corpus. City of Bessemer v. Eidge, 162 Ala. 201, 50 So. 270; Chappell v. State, 156 Ala. 188, 47 So. 329. If, however, the ordinance in question is not obnoxious to any provision of the State or Federal Constitution, or does not contravene some statute law of the State, the petitioner would not be entitled to his discharge on habeas corpus.

It is clearly within the charter powers of the City of Bessemer to adopt and enforce ordinances to conserve and protect the rights of its people, for the preservation of the comfort of the inhabitants, and for their safety and welfare. The preservation of the public peace and order is said to be one of the primary functions of municipal corporations; and certainly, comprehended within these broad powers, is the power to preserve "its own integrity as a government" not inconsistent with the Constitution and statute law of the state, or with the Constitution of the Federal Government.

Section 4 of the Bill of Rights provides: "That no law shall ever be passed to curtail or restrain the liberty of speech or of the press; and any person may speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that liberty."

The First Amendment to the United States Constitution provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances."

The concrete question here is, Did these provisions, or either of them, which secure the freedom and liberty of speech and of the press, deprive the municipality of Besse-

mer of the right to adopt the ordinance in question?

■ Whether the ordinance under attack was wisely conceived, or whether the evils and dangers sought to be curbed by it would best be met by education, and the exercise of a modicum of patience, we are not called upon to determine. The sole function of the court is to determine the constitutionality of the law as written, not its wisdom or unwisdom.

■ It is recognized in England, Canada, and in America, in fact, in every English speaking government, that the press is one of the most potent factors in the establishment and maintenance of free government known to an enlightened civilization. The framers of the Constitution of the United States, and of our State Constitution, were not unmindful of this fact when they wrote into these instruments the provisions guaranteeing the freedom of speech and of the press. A free government has never tolerated the muzzling of the press or the stifling of free speech. At most, it has only held those who enjoy this freedom answerable for an abuse thereof. Among the undoubted rights of the press may be mentioned right to advocate change in form of government by peaceful means; to expose incompetency and corruption on the part of those charged with the administration of the affairs of the government; and the right at all times to place before its readers, in printed form, the current happenings of the day.

■ This constitutional liberty of the press is so intimately interwoven with the right to acquire and hold property, to enjoy life and the pursuit of happiness, that it falls squarely within the protection of section 1 of the Constitution, which guarantees to every citizen the right of life, liberty, and the pursuit of happiness, and also comes within the protection of section 6 of the State Constitution and of the Fourteenth Amendment to the Federal Constitution guaranteeing to every person *due process* of *law*, both judicial and legislative. Any denial to the press of this constitutional right by the courts, or by the Legislature, or any limitation superimposed upon this right, save for abuse, would inflict a wound just short of the heart upon this useful agency, so sedulously protected by the Constitution.

So then, in the consideration of the question here involved, the fundamental right of free speech and of the press must be borne in mind. It must also be borne in mind that abuse can only begin where this right of free speech and of the press ends.

■ We shall approach the question here presented fully cognizant of the fact that the only limitation that can rightfully be placed upon the liberty of the press is that it shall be held responsible for abuse.

■ Judge Story, in his treatise on the Constitution, in discussing "The freedom of the press and of speech, which Congress, by the First Amendment to the Federal Constitution is prohibited from abridging," says: "That this amendment was intended to secure to every citizen an absolute right to speak, or write, or print whatever he might please, without any responsibility, public or private, therefor, is a supposition too wild to be indulged by any rational man. * * * It is plain, then, that the language of this amendment imports no more than that every man shall have a right to speak, write, and print his opinions upon any subject whatsoever, without any prior restraint, so always that he does not injure any other person in his rights, person, property or reputation; and so always that he does not thereby disturb the public peace, *or attempt to subvert the government."* (Italics supplied.) 2 Story on the Constitution (5th Ed.) pp. 634, 635.

The Court of Appeals of New York in People v. Most, 171 N.Y. 423–431, 64 N.E. 175, 178, 58 L.R.A. 509, said: "While the right to publish is thus sanctioned and secured, the abuse of that right *is excepted from the protection of the constitution,* and authority to provide for and punish such abuse is left to the legislature. The punishment of those who publish articles which tend to corrupt morals, induce crime, or destroy organized society is essential to the security of freedom and stability of the state. While all the agencies of government—executive, legislative and judicial— cannot abridge the freedom of the press, the legislature may control and the courts may punish the licentiousness of the press." (Italics supplied.)

Mr. Tiedeman in his treatise on Limitations of Police Powers, § 81, p. 192, says:

"The constitutional liberty of speech and of the press, as we understand it, implies a right to freely utter and publish whatever the citizen may please, and to be protected against any responsibility for so doing, except so far as such publications, from their blasphemy, obscenity, or scandalous char-

acter, may be a public offense, or as, by their falsehood and malice, they may injuriously affect the standing, reputation, or pecuniary interests of individuals."

"So, also, it is not to be inferred from the prohibition of a censorship of the press, that the press, can without liability for its wrongful use, make use of the constitutional privilege for the purpose of inciting the people to the commission of crime against the public. The newspapers of anarchists and nihilists cannot be subjected to a censorship, or be absolutely suppressed; but if the proprietors should in their columns publish inflammatory appeals to the passion of discontents, and urge them to the commission of crimes against the public or against the individual, they may very properly be punished, and without doubt the right to the continued publication may be forfeited as a punishment for the crime."

The Court of Appeals of New York, in the case of People of New York v. Gitlow, 234 N.Y. 132, 136 N.E. 317, 319, was called upon to consider and determine the constitutionality of certain statutes of the state, defining and punishing criminal anarchy. Subsection 2 of section 161, Penal Law, provides that any person who "Prints, publishes, edits, issues or knowingly circulates, sells, distributes or publicly displays any book, paper, document, or written or printed matter in any form, containing or advocating, advising or teaching the doctrine that organized government should be overthrown by force, violence or any unlawful means," is guilty of a felony and punishable by imprisonment for not more than ten years, or by a fine of not more than five thousand dollars, or both.

The Court of Appeals of New York sustained the constitutionality of this statute, and in doing so used the following language:

"The Constitution, federal or state, does not authorize publications which advocate the assassination of public officials. People v. Most, supra. Neither does it authorize publications advocating the destruction of the government by violence or unlawful means.

"The Legislature of this state, therefore, was within its powers when it enacted sections 160 and 161 of the Penal Law." People v. Gitlow, supra.

The decision in the Gitlow Case, supra, was carried by the defendant to the Supreme Court of the United States for review by that court. of the judgment of the Court of Appeals of New York.

In response to this appeal (Gitlow v. New York, 268 U.S. 652, 45 S.Ct. 625, 630, 69 L.Ed. 1138), Mr. Justice Sanford, in writing for the court, said:

"It is a fundamental principle, long established, that the freedom of speech and of the press which is secured by the Constitution, does not confer an absolute right to speak or publish, without responsibility, whatever one may choose, or an unrestricted and unbridled license that gives immunity for every possible use of language and prevents the punishment of those who abuse this freedom. 2 Story on the Constitution (5th Ed.) § 1580, p. 634; Robertson v. Baldwin, 165 U.S. 275, 281, 17 S.Ct. 326, 41 L.Ed. 715; Patterson v. Colorado, 205 U.S. 454, 462, 27 S.Ct. 556, 51 L.Ed. 879, 10 Ann.Cas. 689; Fox v. Washington, 236 U.S. 273, 276, 35 S.Ct. 383, 59 L.Ed. 573; Schenck v. United States, 249 U.S. 47, 52, 39 S.Ct. 247, 63 L.Ed. 470; Frohwerk v. United States, 249 U.S. 204, 206, 39 S.Ct. 249, 63 L.Ed. 561; Debs v. United States, 249 U.S. 211, 213, 39 S.Ct. 252, 63 L.Ed. 566; Schaefer v. United States, 251 U.S. 466, 474, 40 S.Ct. 259, 64 L.Ed. 360; Gilbert v. Minnesota, 254 U.S. 325, 332, 41 S.Ct. 125, 65 L.Ed. 287; Warren v. United States, 106 C.C.A. 156, 183 F. 718, 721, 33 L.R.A. (N.S.) 800. Reasonably limited, it was said by Story in the passage cited, this freedom is an inestimable privilege in a free government; without such limitation, it might become the scourge of the republic.

"That a State in the exercise of its police power may punish those who abuse this freedom by utterances inimical to the public welfare, tending to corrupt public morals, incite to crime, or disturb the public peace, is not open to question. Robertson v. Baldwin, supra [165 U.S. 275] page 281, 17 S.Ct. 326 [41 L.Ed. 715]; Patterson v. Colorado, supra [205 U.S. 454] page 462, 27 S.Ct. 556 [51 L.Ed. 879, 10 Ann.Cas. 689]; Fox v. Washington, supra [236 U.S. 273] page 277, 35 S.Ct. 383 [59 L.Ed. 573]; Gilbert v. Minnesota, supra [254 U.S. 325] page 339, 41 S.Ct. 125 [65 L.Ed. 287]; People v. Most, 171 N.Y. 423, 431, 64 N.E. 175, 58 L.R.A. 509; State v. Holm, 139 Minn. 267, 275, 166 N.W. 181, L.R.A.1918C, 304; State v. Hennessy, 114 Wash. 351, 359, 195 P. 211; State v. Boyd, 86 N.J. Law, 75, 79, 91 A. 586; State v. McKee,

24

73 Conn. 18, 27, 46 A. 409, 49 L.R.A. 542, 84 Am.St.Rep. 124. Thus it was held by this Court in the Fox Case, that a State may punish publications advocating and encouraging a breach of its criminal laws; and, in the Gilbert Case, that a State may punish utterances teaching or advocating that its citizens should not assist the United States in prosecuting or carrying on war with its public enemies.

"And, for yet more imperative reasons, a State may punish utterances endangering the foundations of organized government and threatening its overthrow by unlawful means. These imperil its own existence as a constitutional State. Freedom of speech and press, said Story, supra, *does not protect disturbances to the public peace or the attempt to subvert the government. It does not protect publications or* teachings which tend to *subvert or imperil* the government or to impede or hinder it in the performance of its governmental duties. State v. Holm, supra [139 Minn. 267] page 275, 166 N.W. 181 [L.R.A.1918C, 304]. *It does not protect* publications prompting *the overthrow of government by force;* the punishment of those who publish articles which tend to destroy organized society being essential to the security of freedom and the stability of the state. People v. Most, supra [171 N.Y. 423] pages 431, 432, 64 N.E. 175 [58 L.R.A. 509]. And a State may penalize utterances which openly advocate the overthrow of the representative and constitutional form of government of the United States and the several States, by violence or other unlawful means. People v. Lloyd, 304 Ill. 23, 34, 136 N.E. 505. See, also, State v. Tachin, 92 N.J.Law, 269, 274, 106 A. 145; and People v. Steelik, 187 Cal. 361, 375, 203 P. 78. In short this freedom does not deprive a State of the primary and essential right of self preservation; which, so long as human governments endure, they cannot be denied. United States ex rel. Turner v. Williams, 194 U.S. 279, 294, 24 S.Ct. 719, 48 L.Ed. 979. In Toledo Newspaper Co. v. United States, 247 U.S. 402, 419, 38 S.Ct. 560, 564, 62 L.Ed. 1186, it was said: 'The safeguarding and fructification of free and constitutional institutions is the very basis and mainstay upon which the freedom of the press rests, *and that freedom,* therefore, does not and cannot be held to *include the right virtually to destroy such institutions.'"* (Italics supplied.)

Following the expressions of the above views, so forcefully expressed by Mr. Justice Sanford, the Supreme Court of the United States held the above-quoted provisions of the New York statute leveled against the advocacy of criminal anarchy to be well within the police power of the state of New York, and was not an unwarranted abridgement of the freedom of speech or press, and that the statute was constitutional.

It is to be noted that the ordinance now under attack is in the exact language of the New York statute, except the ordinance carries the additional words: "Or to have in possession *any such* book, paper, document or written or printed matter in any form *for the purpose or with the intention* of distribution, sale, circulation or display thereof within the city of Bessemer or the police jurisdiction thereof."

In the opinion of the Court of Appeals, now under review, it is held that the ordinance in question is "too broad in its scope, in that it would condemn as a violation the printing, publishing, editing, issuing, or knowingly circulating, selling, distributing, or publicly displaying, any book, etc., or the having in possession of such document for a perfectly lawful purpose." And the court then proceeds to state its view on the subject thus: "If the ordinance had read, it shall be unlawful to print, publish, edit, issue, knowingly circulate, sell, distribute, or publicly display, any book, paper, document, written or printed matter in any form *for the purpose* of advocating, advising or teaching the doctrine that organized government should be overthrown by force, violence, or any unlawful means, or, *with a like purpose* to have in possession any such book, etc., the ordinance would have met every objection to its legality and constitutionality, but, omitting as it does the charge as to the purpose and intent of the possession or publishing, the ordinance invades the Constitution and therefore cannot be upheld."

It is quite evident from the foregoing statement in the opinion of the Court of Appeals that that court declined to follow the holdings of the Supreme Court of Illinois, New York, Connecticut, New Jersey, Minnesota, Washington, and of the Supreme Court of the United States, for it would seem that the ordinance in question finds direct support in the holdings of the above courts.

The added clause, "or to have in possession *any such* book, paper, document, or written or printed matter in any form, *for the purpose* or with the intention of distribution, sale, circulation, or display thereof," were evidently intended to prevent any evasion of the features of the ordinance theretofore expressed, and are to be construed in connection with them, so that the possession mentioned must be with the intent and purpose there declared.

It is not unusual to prohibit the possession of an article for an unlawful purpose, or to prohibit the possession of an article which has fallen under the condemnation of the law.

██ We are fully persuaded that the words added to the ordinance in question, which do not appear in the anarchy statute of New York (which was upheld by the Supreme Court of the United States), do not render the ordinance so broad in scope as to bring it into conflict with any provision of the State or Federal Constitution.

Section 4 of the Bill of Rights does not place any restraint upon the Legislature of the state, or upon any municipality, in the exercise of the police power, to pass laws to curb and punish the publication of matter injuriously affecting society; nor has it taken from the state, or from the municipalities thereof, the essential and all important right of self-preservation; nor does it confer upon any one an unbridled license to speak or print what he pleases, or to publish matter advocating or teaching the insidious and deadly doctrine that existing government should be overthrown by force, violence, or by any unlawful means: Any attempt to accomplish such results by words, spoken or printed, would transcend any right of free speech or free press guaranteed by the Constitution, and would constitute a flagrant abuse of the constitutional privilege.

While public opinion should be enlightened, and political vigilance should be taught, yet this must be done within constitutional bounds.

It has already been recognized that the "exercise of a right is essentially different from an abuse of it." Common sense teaches the broad doctrine, "sic utere tuo ut alienum non laedas; so exercise your freedom as not to infringe the rights of others, or the public peace and safety." Story on the Constitution (5th Ed.) § 1889, p. 642.

In America there is but one recognized way of changing the government, and that is by the people in orderly elections. Any effort, organized or unorganized, to overthrow the existing government by force or violence, or by other unlawful means, is but anarchy, pure and simple and certainly one who would lend himself to the accomplishment of such a result by such means, can find no haven under the State or Federal Constitution. A man has the undoubted right to think as he pleases, his thoughts are his own, and no restraint can be laid upon freedom of thought, but, if his thoughts are dangerous and destructive to organized society, he must keep them in his own bosom. He cannot sell them to the public.

In line with the holding of the courts of last resort in other states, as well as that of the Supreme Court of the United States, it is our judgment and conclusion that the ordinance is not violative of any provision of the Constitution of the United States or of the state of Alabama, and is therefore valid.

It follows, therefore, that the judgment of the Court of Appeals declaring the ordinance unconstitutional, and in discharging the prisoner, must be reversed, and the cause remanded to that court for its further consideration in conformity to this opinion. In the meanwhile let the prisoner remain in custody until discharged by due process of law.

Writ awarded. Reversed and remanded.

All the Justices concur.