## Commonwealth v. Sherman et al.

6

*John A. Boyle* and *Ward C. Henry*, for Commonwealth.
*Michael Saxe* and *Wesley H. Caldwell*, for defendants.

LEWIS, J., Aug. 22, 1930.—The Passon Athletic Field is located on Spruce Street, between 48th and 49th Streets, in Philadelphia. The field is enclosed on all sides, and for many years in season what are known as semi-professional or amateur baseball games have been played at the field. The defendant, Malcolm McGowan, on Sunday, Aug. 3, 1930, was the manager of the field and of the Passon baseball team. The defendant, Edward Sherman, was acting manager of the North Penn Athletic Club and of its baseball team, which on the Sunday in question was playing in opposition to the Passon team by invitation. The defendant, Todd Vorhees, was the umpire, chosen to officiate at the game arranged for Aug. 3rd. On the field were erected stands containing seats for several thousand spectators. The defendants, Sherman and McGowan, had arranged the contest for Aug. 3rd, and during the progress of the game, which began about 3.15 P. M., from twenty-five hundred to three thousand persons had assembled by invitation, conveyed through advertising, to witness the exhibition.

The Passon field is located in a high-class residential section, largely built up. As far as the evidence indicates, athletic contests have been conducted at the field for many years without substantial objection from the residents of the neighborhood; at least, no legal action has at any time been instituted to enjoin the athletic events habitually conducted on the premises. This is true of contests staged on Sundays as well as on weekdays.

Philadelphia police officers were present at the field on Aug. 3rd at the time of the beginning of the baseball game, and five or six officers entered the field enclosure against the objection of counsel for those in control. Police Sergeant Reavey testified at the hearing before us that, after entering the field, he warned both managers, defendants McGowan and Sherman, that if there was any attempt to commercialize the baseball game that day, or any violation of the law, such as disorderly conduct, they, the defendants, would be placed under arrest; that there was the usual noise from the spectators and players incident to the conduct of a baseball contest; that at the end of the fourth inning, defendant McGowan and his counsel, Mr. Saxe, left the players' bench and started out on the field accompanied by a group of photographers; that McGowan took óff his cap and walked up into the stands and solicited contributions of money from the spectators; that thereupon Officer Dilmore beckoned to McGowan to come down and informed him

that he was under arrest; whereupon the umpire turned to the crowd and stated that if any one cared to make contribution toward the expenses of both teams, he could do so by throwing coins on the field, and that he, the umpire, would personally collect the coins. Sergeant Reavey stated that many of the spectators arose to their feet and yelled, and that numerous persons started to pitch coins into the field; that he thereupon called Officer Travers and ordered him to arrest Vorhees; that Sherman then came over from the corner of the field and started to pick up some of the coins; that Police Officer Connor placed him under arrest; that prior to these last-mentioned occurrences McGowan had asked the spectators to maintain quiet. The sergeant said that his orders were to take action if there was any violation of the law at the game, such as disorderly conduct; that he did not regard the taking of the collection as disorderly conduct; that if what occurred on the Sunday in question had taken place on a weekday, he would not have made any arrests; that there are six churches within two city blocks of the baseball field, and some of them have services on Sunday afternoon, and that this last circumstance, coupled with the fact that there were apartment houses and single-family residences in the neighborhood, was sufficient for the police to take action on Sunday.

Police Officer James Travers testified that he arrived at the field about 2.30 in the afternoon, as it was located on his beat; that the noise occurring during the game was the ordinary noise of a ball game, the loudest of which he thought could be heard about a square away; that there were no fights, no arguments or other disorder.

Officer Dilmore testified that he went onto the field and took a seat on the Spruce Street side about half-way up the grandstand, and that about the beginning of the fifth inning, when contributions were solicited by McGowan, he warned him against taking up a collection, placed him under arrest and sent him to the station-house "for disorderly conduct;" that McGowan, in soliciting contributions, was passing his hat around among the spectators.

Officer Connor, who arrested Sherman, stated that Sherman remarked to him after he had been placed under arrest, "I am losing money on this game," referring to the North Penn Athletic Club.

There was no other police evidence, but certain residents of the neighborhood testified that there was noise from the game on this particular Sunday; one, the proprietor of an apartment house, alleged that the noise interfered with the rest of her tenants, and another, Mr. Creelmen, stated that the noise interfered with his own rest and that of his family.

Hence, it will be observed that there was no testimony on the part of the Commonwealth that the police had at any time ordered the players or spectators at the ball game to disperse and that such an order was resisted or disobeyed.

The Director of Public Safety of Philadelphia, the Honorable Lemuel B. Schofield, submitted himself as a witness before us, and courageously and frankly outlined to the court the policy maintained by his department with reference to baseball games played on Sunday, indicating that since he had taken office as directing head of the police, he had continued the policy of his predecessors toward such sport and that he had endeavored in every way to sensibly reconcile the discordant attitudes of groups in the community toward Sunday observance, and that he regarded the taking of a collection at a Sunday baseball game as a commercialization of the exhibition or exercises, and had ordered the police to take action whenever such collections were sought.

It was conceded that no admission fee was charged for the game out of which this controversy arose, and it appears to be conceded that the players on both teams were not professional baseball players—that is, they did not follow baseball playing as an occupation or worldly employment. The evidence as to the purpose of the collection was scant and vague, but it may be assumed that neither of the clubs engaged in the contest was operated for profit or engaged in basball as a business, and that the contributions were sought for the purpose of paying the expenses of the contest.

The evidence offered on behalf of the defendants included testimony that Sunday baseball games had been played at the Passon field on three Sundays preceding Aug. 3rd, that there had been no police or neighborhood complaints of disorder, and on the Sunday in question there was no loud, boisterous or unseemly noise, no disorder or annoyance that could be termed a breach of the peace, and that the only acts of the defendants of which the police complained were such as were incident to the passing of a hat before the spectators to obtain contributions and the solicitation of contributions from the field and the picking up of the coins tossed thereon.

At the police station, the defendants appear to have been admitted to bail for a hearing on the following Monday, at which hearing charges were made against each of them under the Act of Assembly approved May 2, 1901, § 1, P. L. 132, which act reads as follows:

"Section 1. . . . That from and after the passage of this act, if any person or persons shall wilfully make or cause to be made any loud, boisterous and unseemly noise or disturbance to the annoyance of the peaceable residents near by, or near to any public highway, road, street, lane, alley, park, square or common within this Commonwealth, whereby the public peace is broken or disturbed or the traveling public annoyed, he, she or they shall be guilty of the offense of disorderly conduct, and upon conviction thereof before any justice of the peace, alderman, mayor or burgess shall be sentenced to pay the costs of prosecution and to forfeit and pay a fine not exceeding ten dollars, and in default of the payment thereof shall be committed to and imprisoned in the county jail of the proper county for period not exceeding thirty days: Provided, however, that the defendant or defendants, within five days after such conviction, may appeal to the Court of Quarter Sessions of the county in which said justice of the peace, alderman, mayor or burgess shall reside, without special allowance therefor, upon entering into a recognizance in double the amount of costs and fine, conditioned for the appearance of defendant or defendants at the next term of Quarter Sessions to answer said charge."

Specifically, the allegation against the defendants was that they had wilfully made or "caused to be made loud, boisterous and unseemly noises and disturbances to the annoyance of the peaceable residents nearby, whereby the public peace was broken and disturbed and the traveling public annoyed." The evidence produced before the magistrate was substantially the same as that offered before us when the appeal was heard and which we have outlined above. The magistrate found the defendants guilty and imposed a fine of $10 and costs against each as provided in the Act of 1901. Appeals were allowed by us to the Quarter Sessions Court.

Before proceeding to decide this case upon the facts, we have been faced with a difficulty arising out of the very apparent unconstitutionality of that portion of the Act of 1901 contained in the proviso. It is in direct conflict with article v, section 14, of the Constitution of Pennsylvania, in attempting to authorize appeals from summary convictions without allowance by a court

of record. An additional question of validity arises because of a defect in the title of the act, which gives no notice of the change in the definition of the offense of disorderly conduct contained in the body of the act.

Whether section 1 can stand as valid legislation apart from the proviso depends primarily upon the determination of the legislative intention. We are inclined to the view that the Legislature would have enacted the main body of section 1 if apprised of the unconstitutionality of the proviso, and that the two divisions of the act are separable. However, "the invalidity of a section of a criminal statute which is not involved in the prosecution in question will not be considered:" 36 Cyc. 984; and we will discuss and decide the issue upon grounds that will be more in accord with the desire of the police department, which seeks guidance, and of the defendants, who ask an adjudication of their rights in the circumstances.

While the so-called blue law or Sunday observance legislation is not directly brought into the case by the charges and testimony, yet it is inextricably involved, for the reason that since the 18th century, in this Commonwealth, and for many centuries prior, dating from the reign of the Emperor Constantine A. D. 321, Sunday has been differentiated from the other days of the week, and whether certain conduct is disorderly within the meaning of the law is to be determined not only from the nature of the acts, but from the time and place of their occurrence. That which may be deemed innocent, orderly, "seemly" and lawful on a weekday in the same environment and under the same circumstances, may by law and custom be wrongful, "unseemly" and criminal when happening on Sunday. The public peace is more fragile, more brittle, on Sunday, and is, therefore, the more easily broken or disturbed.

The Sunday observance laws have been judicially interpreted in two somewhat different lines of decisions; the first, adopted by the more orthodox of our judges, reasons that the Christian religion is a part of the common law of our land, and that in the eyes of the law, the Christian "Sabbath" or Sunday is a holy day, the sanctity of which is to be jealously maintained; that the law sets aside Sunday not only as a day of rest, but as a period for religious worship according to the dictates of one's conscience. The other group of decisions justifies the Sunday observance laws as creating a "legalized day of rest," these judges apparently being somewhat careful to maintain a consistency with our governmental theory of the absolute separation of church and state.

Regardless of the legal ground upon which the peculiar character of Sunday is founded, no wise person would seek in any way to deprive human beings of the beneficent and altogether wholesome effect of this periodic cessation from the toil incident to worldly occupation and of the free opportunity which it affords for religious practices, including church attendance, meditation and private devotion. Economically, the tendency is rather decidedly toward the shortening of the work-week to five days, that Saturday may be added to the period of rest and recreation.

Our courts, when appealed to, have been firm to deny to commerce and gain any encroachment on Sunday, by enforcing that portion of the Act of 1794 which forbids the pursuit of business, one's occupation and worldly employment on that day. We may say that the courts appear to have gone beyond the people themselves as indicated by the habits and customs of a large part of the population. What has given rise to great controversy, with regard to the Sunday observance laws, is the fact that religious practices do not habitually engross all the time of even the most devout among us on

Sunday, and the problem has always been what disposition could be made of such free time, after or between church services.

A statute that runs counter to the habits and customs of a majority of the people whom it affects is not really a law; it is a "bugaboo," a scarecrow that cows only the timid and amuses the bold. The Act of 1794 has accomplished much good, but in part it has been dead for a hundred years; drastic in the extreme (as construed by the courts) in its attempt to prohibit all sport and diversion whatsoever, as a practical matter it has never been fully enforceable. The act, however, contains an exception of works of necessity and charity, and our changing population, altered habits of life and attitudes of mind, have been partially met by broadened construction of the meaning of the words "necessity" and "charity," so as to legalize formally many activities which the people themselves had long before legalized by custom.

We must recognize, and do recognize, that Sunday is to us hallowed and set apart and that the right to religious practices on that day undisturbed by needless disorder should be protected as far as the consent of the governed will permit it to be done. Acts that interfere with the free and tranquil indulgence of church attendance or private devotion are to be prevented or restricted in every reasonable way. That the trolley car, the motorbus, the pleasure automobile, the radio, have invaded dangerously the peace and quiet of Sunday cannot be denied; nor, apparently, will our people consent to this invasion being turned back. The habits of the people blaze trails which the law must follow.

Having regard to all of which, we are led to consider how far things that were once regarded as non-essential, worldly and frivolous have come to be recognized as wise and necessary, and, therefore, properly to be within the exception contained in the Act of 1794. It was once deemed unladylike for women to engage in any violent exercise, except horseback riding; gentlemen had very little more than two methods of keeping their bodies sound—horseback riding and walking. What was once considered frivolous sport and diversion have now come to be regarded as the very essentials of mental and physical health and well-being. Rest is no longer interpreted to mean only reclining, reading or walking. As long ago as 1853 our Supreme Court, in an opinion written by a very able jurist (Judge Woodward), in ruling upon the conviction of an omnibus driver for violating the Act of 1794 by engaging in his business on Sunday, said:

"It is apparent from these authorities, as well as from the whole history of the instituted Sabbath, and particularly from the preamble to our old Act of 1705, fully quoted in the Commonwealth v. Omit, that *rest* and the *public worship of Almighty God,* were the primary objects of the institution, both as a divine and civil appointment; and it seems to me to follow, as a necessary consequence, *that no means reasonably necessary to these ends can be regarded as prohibited.* Hence, if an invalid, or a person immured for six days within the close walls of a city, *requires a ride into the country as means of recuperation, which is the true idea of rest,* there is nothing in the Act of 1794 to forbid the employment of a driver, horses and carriage on Sunday to accomplish it. Equally lawful is the employment of the same means to go to the church of one's choice, or to visit the grave of the loved and the lost to pay the tribute of a tear. In a very high sense, and perfectly compatible with the statute, these are works of necessity and charity, and had this defendant shown that he was employed for these purposes and that he was merely engaged in accomplishing them, he ought not to have been convicted." [Johnston v. Commonwealth, 23 Pa. 102, 111.]

Those immersed in a maelstrom of the noise and restlessness that appear inseparable from present-day urban life, bound with the chains of family obligation to labors at desk or machine that deplete vitality, often require recreation, exercise or change of mental scene by amusement as the very basis of rest. A large part of the practice of the healing art now is the prescribing and supervision of change in mental exercise, of outdoor physical exercise and stimulation, of amusement, not necessarily worldly, but often in a high degree uplifting. Sermons were long ago found in stones and running brooks, and now are found in open-air musical concerts, travel in the country, contemplation of the tossing of the billows on the sand-strewn shore, and in lectures. Even in religious life, our clergymen can do us little good, are not sound guides, unless they keep in health and occasionally reorient themselves by change of scene, or reinvigorate themselves by the exercise found in sport and diversion.

Who, therefore, is to say that any power, even that of a court, can now revive that part of the Act of 1794 which was—perhaps wrongly—construed to prohibit any "sport or diversion whatsoever" on Sunday? Necessity knows no law, and the judgments of clergyman, physican, philosopher, jurist, lawyer, merchant, mechanic, laborer, housewife and children long ago united to effect a repeal by non-user (37 Cyc., 544) of that extreme portion of the Act of 1794 under discussion.

The remainder of the law remains virile and effective in restraining to a large extent—to such a degree as is really desired by the community—commercial pursuits and other activities that would interfere with the religious character of Sunday.

Hence, Sunday is not now by law and custom so sharply differentiated from other days as was once the fact, but there is nevertheless clear and substantial recognition of the unique nature of the day as a period intended by law to be more tranquil, restful, and, hence, more orderly than other times. With this in mind, we are to inquire whether the defendants offended the law invoked against them, relating to disorderly conduct, and if so, were they subject to arrest on Sunday and without a warrant having been issued?

The evidence justifies the conclusion that the defendants, in their several capacities of managers and umpire, arranged the baseball game and invited and thereby caused the crowd of spectators to assemble. They may be lawfully declared responsible for making or causing to be made such noise, disturbance or disorder as should have been anticipated by them as inevitable or usually incidental to the playing of a baseball game in the presence of several thousand spectators. Admittedly, in connection with the baseball game there was no act of violence committed, invited, excited or threatened, and there was no evidence from which we could conscientiously find that there was any actual disorder in the sense of "lack of order," a crowd "out of control," or the like. There was the noise of cheering and criticism habitually occurring at a neighborhood baseball game, with the additional circumstance that contributions of money were solicited and were being collected.

Mere noisemaking may be disorderly conduct, but something more must be proved against these defendants to justify their arrest on Sunday without a warrant, in the light of another Sunday observance law that counsel appear to have overlooked.

By an Act of 1705, 1 Smith's Laws, 25, § 4, it is decreed:

"No person or persons, upon the first day of the week, shall serve or execute, or cause to be served or executed, any writ, precept, warrant, order, judgment or decree, except in cases of treason, felony or breach of the peace;

12

but the serving of any such writ, precept, warrant, order, judgment or decree shall be void, to all intents and purposes whatsoever; and the person or persons so serving or executing the same, shall be as liable to the suit of the party grieved, and to answer damages to him for doing thereof, as if he or they had done the same without any writ, precept, warrant, order, judgment or decree at all."

For more than two hundred years, therefore, in Pennsylvania it has been the policy of the law to greatly restrict the activity and authority of the police and of the courts on Sunday. A citizen may be arrested lawfully on Sunday on warrant or process issued only for treason, felony or breach of the peace, and the act operates, of course, similarly to restrict arrests without warrant.

While there are to be found in the books decisions of law courts of Pennsylvania which seem to hold that mere noise may be a breach of the peace, yet the better-reasoned authorities distinguish between noise that amounts to a disturbance of mental tranquility and a disorder that amounts to a breach of the peace. The assembling of persons in a mass-meeting without a police permit on Sunday is not unlawful, either as disorderly conduct or as a breach of the peace: Com. v. Cooper et al., 95 Pa. Superior Ct. 382. Judge Orlady, in Com. v. Coleman, 60 Pa. Superior Ct. 380, said that the playing of baseball on Sunday is not in itself a crime under the Act of 1794, and it becomes an unlawful act only when it affects the community as disorderly. "Actual or threatened violence is an essential element of a breach of the peace:" 9 Corpus Juris, 387; 1 Hawk, 254 (relating to bail to keep the peace).

In Com. v. Taylor, 5 Binney, 277, 281, Tilghman, C. J., held that "acts injurious to private persons, which tend to excite violent resentment and thus produce fighting and disturbance of the peace of society," are indictable as a breach of the peace.

"A breach of the peace is an offense well known to the common law. It is a disturbance of public order by an act of violence, or by any act likely to produce violence, or which, by causing consternation and alarm, disturbs the peace and quiet of the community:" People v. Wallace, 83 N. Y. S. 130, 133; People v. Most, 171 N. Y. 423, 64 N. E. Repr. 175, 177, 58 L. R. A. 509 (citing Barb. Crim. Law, 219; Archb. Crim. Prac., 91; Bish. Crim. Law, § 533; Clark & M. Crimes, 983; McClain Crim. Law, § 1012).

"Disorderly conduct" is a broader term than "breach of the peace," and disorderly conduct is not always a breach of the peace, as where it is merely calculated to disturb or annoy: 18 Corpus Juris, 1216; Com. v. Moss, 9 D. & C. 713.

"In general terms, a breach of the peace is a violation of public order, a disturbance of the public tranquility, by any act or conduct inciting to violence or tending to provoke or excite others to break the peace:" 8 Ruling Case Law, 284, § 305.

The best definition of "public peace" that we have found is "that invisible sense of security which every man feels so necessary to his comfort and for which all governments are instituted:" State v. Benedict, 11 Vermont, 236. This definition is frequently quoted, and I accept it because, in my judgment, there must exist in any conduct to make it a breach of the peace some element that affects injuriously the public sense of "security;" in other words, physical safety. "Breaches of the peace" generally manifest themselves by some outward, visible, audible or violent demonstration; not from quiet, orderly and peaceable acts secretly done, though such acts are *mala prohibita:* 8 Ruling Case Law, 285, § 306.

It is loosely said by some that a violation of a law in itself is disorderly conduct, or that repeated violations of the same law constitute disorderly conduct and a breach of the peace, but such views have been considered and rejected by the highest courts in Pennsylvania. In Com. *v.* Foster, 28 Pa. Superior Ct. 400, quoting with approval Com. *v.* Eyre, 1 S. & R. 347, and Com. *v.* Teamann, 1 Phila. 460, both well-known cases on the Sunday laws, it was held that the mere doing of worldly employment on Sunday will not amount to a breach of the peace where the work is done without noise or disorder.

In the Foster case, the defendant had several times been convicted of doing worldly employment on Sunday and had on each occasion paid his fine, and the court said that the several proceedings were then at an end, stating: "This did not establish, nor was it in itself evidence, that he had been guilty of any breach of the peace or disturbed the rest of any citizen." The court ruled, therefore, that a justice of the peace had improperly held the defendant in bail for good behavior merely because of his repeated violation of the Sunday law, saying additionally: "This record contains nothing from which it could be inferred that there was any reasonable ground to apprehend or that this justice of the peace apprehended, that this defendant would commit any felony or misdemeanor, or disturb the peace, *or in any way trouble, disturb or injure any of the people of the state, in their persons or property.*"

In Com. *v.* Eyre, *supra*, Chief Justice Tilghman had previously stated:

"The violation of the Sabbath is a crime which deserves punishment. But when that violation consists of work, without noise or disorder, there is nothing like an actual breach of the peace; nothing of so pressing a nature as to require an immediate and forcible remedy. The serving of legal process on Sunday tends to disturb the quiet of that day, which it is the object of the law, on which this prosecution is founded, to protect [Act of 1794]. Therefore, it is that the serving of all legal process is forbidden by another act [Act of 1705], except in cases of treason, felony or breach of the peace. And there is as much reason to apprehend disturbance from an entry for the purpose of making a conviction as from the serving of process."

In Com. et al. *v.* Smith, 266 Pa. 511, where an injunction was sought against the Commissioners of Fairmount Park to prevent the playing of outdoor games in the park on Sunday, the Supreme Court stated that equity could not interfere to restrain violations of the Act of 1794, that the proposition was unsupported by reason or any known authority. The court added: "For what was made an offense by that act, it provides a penalty. If the playing of lawn tennis or baseball on Sunday is a violation of it, the players are punishable under it; if their playing does not violate it, they are not punishable, and they cannot be restrained from playing unless their games become a nuisance. . . . If the penalty therein provided is not a sufficient deterrent, it is for the legislature to provide another."

In Com. *v.* Smith, 43 Pa. C. C. Reps. 93, it was held by the President Judge of the Quarter Sessions Court of Potter County, in 1914, that the playing of a game of baseball on Sunday was not a breach of the peace, but was only a violation of the Act of 1794, and that police officers had no right to arrest players, as was done, without a warrant first issued. The game was a contest between teams representing the Borough of Galeton, Pa., and the Town of Corning, N. Y., and it was indulged in on Sunday, Aug. 9, 1914. During the progress of the game a member of the State Police went upon the field and arrested without a warrant one of the Corning players. The state policeman was required to defend a charge of assault and battery

instituted by the ball player whom he had thus arrested without a warrant on Sunday; the defendant was convicted, and motions for a new trial and in arrest of judgment were dismissed.

The more convincing authorities of our own state and many to be found in other jurisdictions lead us to the conclusion that we have expressed, which, restated, is that to constitute a breach of the peace there must be some act of violence committed or threa. 'ened. Noise and disturbance, though coming from a more or less large assemblage of persons, must have given rise to some act of violence or must incite terror or fear, or threaten or invite some act of violence to breach the peace.

At least, we may go so far as to say that it is only such a breach of the peace as we have last described as will justify an officer in making an arrest without a warrant and particularly on Sunday in this Commonwealth. It is not to be assumed that the Act of 1705, having for its purpose the restriction of judicial and police activities on Sunday to the most serious and necessary cases, in order that interference with the day of rest should be reduced to a minimum, may be construed to widen police authority by authorizing the arrest without a warrant on that day of persons who could not be lawfully thus arrested on any other day of the week.

We agree with the opinion of Judge McCarthy, in Com. v. Krubeck, 23 Pa. C. C. Reps. 38, in which he held unlawful an arrest on a Sunday without a warrant of a Salvation Army worker who was beating a drum. The defendant woman was charged with beating upon a drum at unseasonable hours of the daytime and at late hours of the night on Sunday, July 30, 1899, while in a certain Salvation Army tent in Roxborough, Philadelphia. She was indicted for a misdemeanor for maintaining a common nuisance. It appeared that the Salvation Army tent was on private property, and that the police officer who arrested the defendant woman entered the tent without a warrant and made the arrest on Sunday. Judge McCarthy said, inter alia:

"The facts of the present case do not disclose that the defendant was engaged in the commission of any act of violence in the presence of the officer, nor does it appear that what she was doing was likely to incite acts of violence in others, or that there was anything in the nature of an affray or breach of the peace accompanied by acts of violence in progress, or that the occurence of such a breach of the peace was imminent at the time the arrest was made. It, therefore, follows that the element of violence, actual or threatened, which was essential to justify the making of this arrest was wanting.

"As the arrest of the defendant was not lawful, the subsequent proceedings based upon it are void. The motion of the defendant is, therefore, sustained, and the indictment is quashed.

"The foregoing is all that is necessary to be said for the decision of this case as presented, but, in order to prevent possible misunderstanding as to the scope and extent of the decision, it is proper to add that the questions whether the act of which the defendant is accused amount to a public nuisance or not, or constitute a breach of the peace, unaccompanied by violence or otherwise, are not decided."

Applying our conclusion, we hold that the evidence produced before us as to the conduct of the baseball game on Aug. 3, 1930, does not establish that disorderly conduct amounting to a breach of the peace was committed by all or any one of the defendants. The arrest of the defendants on Sunday without a warrant was, therefore, unlawful, the whole proceeding being without effect and void.

In order that there may be no misapprehension, and as a guide to those concerned, including the police department, we also conclude:

1. That the conduct of a semi-professional or amateur baseball game at the Passon field, located as it is in a built-up residential section of a large city, is unlawful on Sunday, when, in connection with the playing of the game, a large crowd of spectators is invited and permitted to assemble on the field and to engage in noisy demonstrations.

2. That the police have the right to enter all ball parks, hippodromes, arenas, theatres or other places in which large numbers of persons are invited to assemble, whenever, in the judgment of the police authority, the presence of such officers of the law is necessary to protect the public against accident, sudden disorder, criminal practices—for example, from pocket-picking—or for other proper purposes. Hence, the police officers had a right to enter upon Passon field during the progress of this baseball game, notwithstanding it was private property, for it was private property then being devoted to a public use or quasi-public use.

3. The police have a discretion, which, as is indicated in Com. v. Cooper, 95 Pa. Superior Ct. 382, should be most prudently exercised, of dispersing all unwieldy assemblages of persons on the public highway, or other assemblages of persons that are disorderly or noisy, though their conduct falls short of a breach of the peace. Arrests for such noisy demonstrations or minor disorders cannot be made without a warrant either on weekdays or Sundays. A disobedience of such a police order to disperse is a breach of the peace, however, and justifies arrest without a warrant.

4. Games of baseball conducted for profit by corporations or others organized for that purpose and/or participated in by players to whom baseball playing is a regular occupation or worldly employment are now unlawful in Pennsylvania on Sunday. This was clearly and finally adjudged by the Supreme Court of Pennsylvania in Com. ex rel. v. American Baseball Club of Philadelphia, 290 Pa. 136.

5. Amateur or non-professional baseball and other orderly sports or diversions may now be freely practiced on Sunday by men, women and children for exercise, recreation or innocent amusement, and spectators may be lawfully assembled at such games where no admission fee is charged and the exhibition is not otherwise commercialized; provided, that the places selected for such games of exercise and amusement are not located in built-up residential sections of a community or elsewhere where the games would by unseemly noise or disturbance interfere with religious worship or the Sunday rest of residents of the neighborhood.

6. The mere taking up of a voluntary collection at an amateur baseball game played on Sunday is not disorderly conduct per se, is not a breach of the peace, and is not necessarily a commercialization of the sport, although when a collection is adopted as a subterfuge in lieu of an admission fee at an exhibition really held for profit, the entire affair is thereby made unlawful on Sunday.

7. The exaction of a fee for admission to places of instruction and amusement, such as the Zoölogical Garden, and to orchestral concerts, such as are held in the Dell of Fairmount Park, on Sunday evening, does not make the operation of such places unlawful. If an admission fee is in fact exacted only as a necessity to meet the expenses of such philanthropic and public projects maintained for the common good, there is not present the element of commercialization or worldly employment in the sense forbidden by the Act of 1794.

We have some knowledge of crime, of criminals, and of the conditions which breed the acts and the actors. Those of us who live in metropolitan communities, comprising a population whose ingredients have come from all parts of the earth, bringing with them varying habits, customs, moral standards, religious principles and practices, know that nothing is so fatal to such city-bred youth as idleness. Satan—to personify the force of evil—still finds something for the idle brain and the idle hands of young and old to do. More orderly and wholesome communities will be maintained when we can provide healthy outdoor sport, preferably competitive in character, and amusement to all of those countless thousands of young and old who have no lawns adjacent to their homes, no gardens, no spacious living-rooms, no libraries, whose playgrounds now are the streets and vacant lots, and who, if they are not permitted to play during the free time of Sunday on those streets and vacant lots, will congregate in dark places where moral fiber rots and clean thoughts give place to foul.

The defendants are found not guilty and are discharged.