CINCINNATI (City), Plaintiff-Appellee, v. KING, Defendant-Appellant.

Common Pleas Court, Hamilton County.

No. A-160166. Decided June 25, 1958.

Lyle Castle, City Solicitor, for appellee.
Harry H. McIlwain, for appellant.

**OPINION**

By LEIS, J.:

This is an appeal from the Cincinnati Municipal Court arising out of the defendant's conviction for violation of Section 901-i3 of the Code of Ordinances of the City of Cincinnati.

Code Section 901-i3 of which the defendant stands convicted, in full force and effect at the time of the violation, reads as follows:

"Whoever shall print, engrave, sell, offer for sale, give away, exhibit or publish, or exhibit as for sale or other purpose, or have in his possession or under his control, any obscene, lewd, lascivious, indecent, or immodest book, pamphlet, paper picture, image, cast, statuary, drawing or representation, or any other article of an indecedent or immoral nature, or book, paper, print, circular or writing made up principally of pictures or stories of immodest deeds, lust or crime, or shall exhibit upon the public street or highway, any of the articles or papers, prints, publications, as aforesaid, within the view of passersby upon said street or highway, shall be fined not more than one hundred ($100.00) dollars, or imprisoned not more than sixty (60) days, or both." (Emphasis by Court.)

The case was tried to the Court, a jury being waived by the defendant. The City, in support of its case, introduced two expert witnesses: Gordon J. Wedig, a member of the Cincinnati Police Department, Youth Aid Bureau, and Clair Hubert, Associate Professor of Psychology at the University of Cincinnati. The defense offered no oral testimony, but moved for dismissal of the action on the grounds of failure of proof beyond a reasonable doubt and unconstitutionality of the ordinance in question. The trial court overruled the motion to dismiss. After due consideration, the Court found defendant guilty of violation of the ordinance.

First, let us turn to the issue of constitutionality which has been raised. It is well settled that legislation of this type does not violate the constitutional provisions of free speech and free press. Nor does such legislation deprive an accused of due process of law. The Supreme Court of the U. S. in 1925, in the case of Gitlow v. N. Y., 268 U. S. 652, held that the guarantees of the First Amendment are incorporated in the due process clause of Amendment XIV.

Amendment I of our Constitution reads that—

"Congress shall make no law respecting the establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech or of the press; * * *."

This First Amendment, according to the well established law, is incorporated into Amendment XIV which reads in part:

"* * * no state shall make or enforce any law which shall abridge the privileges or immunities of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law, * * *."

The Supreme Court of the United States in Roth v. United States, 354 U. S. 476, 77 S. Ct. 1304, speaking through Mr. Justice Brennan, said that—

"* * * it is apparent that the unconditional phrasing of the Frist Amendment was not intended to protect every utterance."

And again:

"The protection given speech and press was fashioned to assure

unfettered interchange of ideas for the bringing about of political and social changes desired by the people. * * * All ideas having even the slightest redeeming social importance—unorthodox ideas, controversial ideas, even ideas hateful to the prevailing climate of opinion—have the full protection of the guaranties, unless excludable because they encroach upon the limited area of more important interests. But implicit in the history of the First Amendment is the rejection of obscenity as utterly without redeeming social importance. This rejection for that reason is mirrored in the universal judgment that obscenity should be restrained, reflected in the international agreement of over fifty nations, in the obscenity laws of all of the forty-eight States, and in the twenty obscenity laws enacted by the Congress from 1842 to 1956."

The Constitution of these United States of America has endured since its adoption, and among the rights 'most sacredly protected are those of free speech and free press. The Preamble is the key to the scope and purposes of this document, and is taught to every school boy and girl in this nation.

By the largest stretch of imagination, due process was never intended to protect forces which tend to destroy the domestic tranquility and the general welfare referred to in the Preamble. One can not flaunt the Constitution and then seek refuge in due process of law and demand its protection. The Constitution is meant not as a weapon to enable those individuals of weak moral fibre to inflict upon the populace types of publications left better unpublished. There is a majesty to the law that was ordained to subserve the ends of justice; not to be used as a bastille to corrupt the morals of the very citizens for whom this law is designed to protect.

In **State of Ohio v. Kassay, 126 Oh St 177** (not followed as to certain holdings in regard to appellate jurisdiction, but still the law as to the point in issue in the instant case), Chief Justice Marshall, speaking for a majority of the Court in upholding the constitutionality of a criminal syndicalism statute, cited with approval People v. Most, 171 N. Y. 423, 64 N. E. 175, concerning abuse of the constitutional guarantee of freedom of the press:

"While the right to publish is thus sanctioned and secured, the abuse of that right is excepted from the protection of the constitution, and authority to provide for and punish such abuse is left to the legislature. The punishment of those who publish articles which **tend to corrupt morals**, induce crime or destroy organized society, is essential to the security of freedom and the stability of the state." (Emphasis added.)

Accordingly, the Court finds appellant's plea of unconstitutionality without merit.

There remains the question as to whether the exhibits in this case are obscene or indecedent to come within the terms of Section 901-i3. Now, what test is to be applied in determining a violation? Paragraph 6 of the syllabus of Roth v. U. S., supra, states:

"Obscene material is material which deals with sex in a manner appealing to prurient interest."

Paragraph 8 of the syllabus reads:

"Standard for judging obscenity is whether the average person, applying contemporary community standards, dominant theme of material taken as a whole appeals to prurient interest."

"Prurient. 1. Inclined to or characterized by lascivious thought."

"Lascivious. 1. Inclined to lust; Wanton or lewd. 2. Inciting to lust or wantonness." (The American College Dictionary.)

To answer this question, as to whether or not these publications meet the test laid down by the Supreme Court, one needs only to turn to the back cover of Exhibit 6, "Cabaret Yearbook," contents seventy-two pages, price $1.00. Use this back cover as a guide to the intellectual and wholesome material inside:

"Who has performed nude before ten million people?

What strip tease club was inspired by Bing Crosby?

When did students riot to see girls naked on the stage?

Why are English girls favorites as Paris nudes?

Where can a girl be undressed by answers to a quiz game?

Read the answers inside."

Five sentences—each one with a key word indicating the same thought: "nude," "strip tease," "naked," "undressed."

Let us examine more of this scholarly literature. The pages are replete with words like "nude," "naked," "rape" and with photographs of scantily clad females. Refer to City's Exhibit 5, "Continental," contents sixty-four pages, price $2.00. Including the covers there are thirty pictures of women briefly dressed, plus various sketches of women's undergarments. There is not one solitary picture of a woman in normal street dress. Suffice to say that the pictures depicting the physical positions of these women in their state of dress—or undress—and the pictures accentuating parts of the women's anatomy are not those usually found displayed above the fireplace in the average American home.

Let us continue this examination of the exhibits themselves. Exhibit 4 is a copy of "GALlery," contents thirty-two pages, price $1.50. Thirty-two pages, thirty-two pictures. Thirty-two pictures, that is, of full page nudity in different poses.

In view of the foregoing can anyone entertain a reasonable doubt that, using the test laid down by the Supreme Court, these publications are obscene, or, more tersely, that these publications are smut for smut's sake?

Among these exhibits is found ample evidence to sustain the conviction of defendant-appellant. These publications not only come within the test of prurient interest using contemporary community standards, but parts of these exhibits are designed for consumption by the sexual pervert. The testimony of Dr. Hubert clearly bears this out. An even more compelling piece of evidence as to this fact can be found on page twenty-nine of Exhibit 2, the actual copy of which the Court will not stoop to print. These publications are trashy, improper, immodest, immoral, filthy and the Court condemns their publication and sale.

Eighty years ago in a case involving publication of obscene matter

the Court, in upholding a Cleveland ordinance prohibiting the publication of such matter, had this appropriate statement to make:

"The law possesses the power to maintain its own dignity, and to protect the public in its purity, we think, as against those who seek to resist and destroy both." (O'Brien v. City of Cleveland, 4 Ohio Dec. Rep. 189.)

Today every American citizen needs a clear and alert mind to meet intelligently the problems that consistently face this nation. Worthless publications of this type undermine our society and work to break down our moral standards.

"I have in the past few years come to the belief that our destiny as a nation depends upon our spiritual strength rather than upon bombs, production, and material wealth." (Judge Harold R. Medina, introduction to "The Art of Advocacy.")

From whence comes this ambition to the high calling of disseminator of filth? Not for one fleeting moment does this Court rise in defense of the appellant or to others in like positions. That he is guilty beyond a reasonable doubt is not to be denied. But such a defendant can not possess for sale such literature unless there is a source or a supplier. Is it possible that such persons as the defendant-appellant are forced to take these types of publications in order to secure the conventional and socially acceptable publications?

In passing, the Court must note that those who organize and publish such worthless material are those who should bear the greater burden of this sin. Publishers of this trash procure the destruction of the healthy mind the same as the narcotics peddler procures the destruction of the healthy body. Is there any sound reason for this base occupation other than to drag others into the mire of immorality? Are these exhibits representative of modern American literature? If the answer be in the affirmative, then such situation is cause for alarm and the American citizen should take inventory of his moral habits and inform his legislators and law enforcement officers that he desires more stringent measures to curtail this bombardment of feculence.

The price for these base publications? There is extorted from the purchaser for these carriers of lewdness a price that amply covers cost of printing plus comfortable profit for material of this quality. For the same amount of money that will buy sixty-four pages of 5½" by 8½" low grade paper packed with high grade obscenity, carnality and perversity, the purchaser can obtain at prevailing supermarket prices one loaf of bread, one quart of homogenized milk, a pound of ground beef, one dozen eggs, a can of tomato soup, two cans of vegetables, a pound of sugar and one package of flavored gelatine. Where, then, is the proper standard of value?

God has created man in His own image; thus there is a sanctity about the human body that was never intended by man's Creator to be the subject of defilement, abuse or mockery. (The Book of Genesis, Chapter 1, Verse 27.)

These are the publications that are available to those who can muster the exorbitant purchase price, be he man, woman or child. This

is the modern American literature that infiltrates into the American home and finds its way to the schools for the perusal and digestion of American children. It must be of great satisfaction to anyone who performs any link in this chain of indecency to ponder upon his superb contribution to our culture base to have a hand in the enlightenment of American youth to the ways of filth and sex perversion.

If these base creatures of low moral calibre wish to wallow in the muck of immorality, then this Court serves notice to all such offenders that it will enforce the letter and spirit of the law to the fullest extent in every case brought within its jurisdiction, and will use its powers to prevent the extension, flourishment and permeation of this sinful and loathsome march of obscenity. If the laws of man are insufficient to punish with the proper degree of force those who are responsible for the abandonment of moral standards and the destruction of clean minds, then we must let these disseminators of filth to their own consciences and to an accounting with One higher than we.

The finding of the Municipal Court should be and is affirmed.