Justice Scalia,
concurring in part and dissenting in part.
The United States is an indivisible “Union of sovereign States.” Hinderlider v. La Plata River & Cherry Creek Ditch Co., 304 U. S. 92, 104 (1938). Today’s opinion, approv *417 ing virtually all of the Ninth Circuit’s injunction against enforcement of the four challenged provisions of Arizona’s law, deprives States of what most would consider the defining characteristic of sovereignty: the power to exclude from the sovereign’s territory people who have no right to be there. Neither the Constitution itself nor even any law passed by Congress supports this result. I dissent.
I—1
As a sovereign, Arizona has the inherent power to exclude persons from its territory, subject only to those limitations expressed in the Constitution or constitutionally imposed by Congress. That power to exclude has long been recognized as inherent in sovereignty. Emer de Vattel’s seminal 1758 treatise on the Law of Nations stated:
“The sovereign may forbid the entrance of his territory either to foreigners in general, or in particular cases, or to certain persons, or for certain particular purposes, according as he may think it advantageous to the state. There is nothing in all this, that does not flow from the rights of domain and sovereignty: every one is obliged to pay respect to the prohibition; and whoever dares to violate it, incurs the penalty decreed to render it effectual.” The Law of Nations, bk. II, ch. VII, § 94, p. 309 (B. Kapossy & R. Whatmore eds. 2008).
See also 1 R. Phillimore, Commentaries Upon International Law, pt. Ill, ch. X, *233 (“It is a received maxim of International Law, that the Government of a State may prohibit the entrance of strangers into the country”).[1]
*418 There is no doubt that “before the adoption of the constitution of the United States” each State had the authority to “prevent [itself] from being burdened by an influx of persons.” Mayor of New York v. Miln, 11 Pet. 102, 132-133 (1837). And the Constitution did not strip the States of that authority. To the contrary, two of the Constitution’s provisions were designed to enable the States to prevent “the intrusion of obnoxious aliens through other States.” Letter from James Madison to Edmund Randolph (Aug. 27,1782), in 1 Writings of James Madison 226 (G. Hunt ed. 1900); accord, The Federalist No. 42, pp. 269-271 (C. Rossiter ed. 1961) (J. Madison). The Articles of Confederation had provided that “the free inhabitants of each of these States, paupers, vagabonds and fugitives from justice excepted, shall be entitled to all privileges and immunities of free citizens in the several States.” Art. IV. This meant that an unwelcome alien could obtain all the rights of a citizen of one State simply by first becoming an inhabitant of another. To remedy this, the Constitution’s Privileges and Immunities Clause provided that “[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States.” Art. IV, §2, cl. 1 (emphasis added). But if one State had particularly lax citizenship standards, it might still serve as a gateway for the entry of “obnoxious aliens” into other States. This problem was solved “by authorizing the general government to establish a uniform rule of naturalization throughout the United States.” The Federalist No. 42, supra, at 271; see Art. I, § 8, cl. 4. In other words, the naturalization power was given to Congress not to abrogate States’ power to exclude those they did not want, but to vindicate it.
*419 Two other provisions of the Constitution are an acknowledgment of the States’ sovereign interest in protecting their borders. Article I provides that “[n]o State shall, without the Consent of the Congress, lay any Imposts or Duties on Imports or Exports, except what may be absolutely necessary for executing it’s inspection Laws.” § 10, cl. 2 (emphasis added). This assumed what everyone assumed: that the States could exclude from their territory dangerous or unwholesome goods. A later portion of the same section provides that “[n]o State shall, without the Consent of Congress, ... engage in War, unless actually invaded, or in such imminent Danger as will not admit of delay.” Cl. 3 (emphasis added). This limits the States’ sovereignty (in a way not relevant here) but leaves intact their inherent power to protect their territory.
Notwithstanding “[t]he myth of an era of unrestricted immigration” in the first 100 years of the Republic, the States enacted numerous laws restricting the immigration of certain classes of aliens, including convicted criminals, indigents, persons with contagious diseases, and (in Southern States) freed blacks. Neuman, The Lost Century of American Immigration Law (1776-1875), 93 Colum. L. Rev. 1833, 1835, 1841-1880 (1993). State laws not only provided for the removal of unwanted immigrants but also imposed penalties on unlawfully present aliens and those who aided their immigration.[2] Id., at 1883.
In fact, the controversy surrounding the Alien and Sedition Acts involved a debate over whether, under the Constitution, the States had exclusive authority to enact such immigration laws. Criticism of the Sedition Act has become a prominent feature of our First Amendment jurisprudence, see, e. g., New York Times Co. v. Sullivan, 376 U. S. 254, *420 273-276 (1964), but one of the Alien Acts[3] also aroused controversy at the time:
“Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That it shall be lawful for the President of the United States at any time during the continuance of this act, to order all such aliens as he shall judge dangerous to the peace and safety of the United States, or shall have reasonable grounds to suspect are concerned in any treasonable or secret machinations against the government thereof, to depart out of the territory of the United States ...An Act concerning Aliens, 1 Stat. 570-571.
The Kentucky and Virginia Resolutions, written in denunciation of these Acts, insisted that the power to exclude unwanted aliens rested solely in the States. Jefferson’s Kentucky Resolutions insisted “that alien Mends are under the jurisdiction and protection of the laws of the state wherein they are [and] that no power over them has been delegated to the United States, nor prohibited to the individual states, distinct from their power over citizens.” Kentucky Resolutions of 1798, reprinted in J. Powell, Languages of Power: A Sourcebook of Early American Constitutional History 131 (1991). Madison’s Virginia Resolutions likewise contended that the Alien Act purported to give the President “a power nowhere delegated to the federal government.” Virginia Resolutions of 1798, in id., at 134 (emphasis deleted). Notably, moreover, the Federalist proponents of the Act defended it primarily on the ground that “[t]he removal of aliens is the usual preliminary of hostility” and could therefore be justified in exercise of the Federal Government’s war powers. Massachusetts Resolutions in Reply to Virginia, in id., at 136.
In Mayor of New York v. Miln, this Court considered a New York statute that required the commander of any ship *421 arriving in New York from abroad to disclose “the name, place of birth, and last legal settlement, age and occupation . . . of all passengers . . . with the intention of proceeding to the said city.” 11 Pet., at 130-131. After discussing the sovereign authority to regulate the entrance of foreigners described by De Vattel, the Court said:
“The power ... of New York to pass this law having undeniably existed at the formation of the constitution, the simple inquiry is, whether by that instrument it was taken from the states, and granted to congress; for if it were not, it yet remains with them.” Id., at 132.
And the Court held that it remains. Id., at 139.
II
One would conclude from the foregoing that after the adoption of the Constitution there was some doubt about the power of the Federal Government to control immigration, but no doubt about the power of the States to do so. Since the founding era (though not immediately), doubt about the Federal Government’s power has disappeared. Indeed, primary responsibility for immigration policy has shifted from the States to the Federal Government. Congress exercised its power “[t]o establish an uniform Rule of Naturalization,” Art. I, §8, cl. 4, very early on, see Am Act to establish an uniform Rule of Naturalization, ch. 3,1 Stat. 103. But with the fleeting exception of the Alien Act, Congress did not enact any legislation regulating immigration for the better part of a century. In 1862, Congress passed “An Act to prohibit the ‘Coolie Trade’ by American Citizens in American Vessels,” which prohibited “procuring [Chinese nationals]... to be disposed of, or sold, or transferred, for any term of years or for any time whatever, as servants or apprentices, or to be held to service or labor.” Ch. 27, 12 Stat. 340. Then, in 1875, Congress amended that Act to bar admission to Chinese, Japanese, and other Asian immigrants who had *422 “entered into a contract or agreement for a term of service within the United States, for lewd and immoral purposes.” An act supplementary to the acts in relation to immigration, ch. 141, 18 Stat. 477. And in 1882, Congress enacted the first general immigration statute. See An act to regulate Immigration, 22 Stat. 214. Of course, it hardly bears mention that federal immigration law is now extensive.
I accept that as a valid exercise of federal power—not because of the Naturalization Clause (it has no necessary connection to citizenship) but because it is an inherent attribute of sovereignty no less for the United States than for the States. As this Court has said, it is an “ ‘accepted maxim of international law, that every sovereign nation has the power, as inherent in sovereignty, and essential to self-preservation, to forbid the entrance of foreigners within its dominions.’” Fong Yue Ting v. United States, 149 U. S. 698, 705 (1893) (quoting Ekiu v. United States, 142 U. S. 651, 659 (1892)). That is why there was no need to set forth control of immigration as one of the enumerated powers of Congress, although an acknowledgment of that power (as well as of the States’ similar power, subject to federal abridgment) was contained in Art. I, § 9, which provided that “[t]he Migration or Importation of such Persons as any of the States now existing shall think proper to admit, shall not be prohibited by the Congress prior to the Year one thousand eight hundred and eight . . . .”
In light of the predominance of federal immigration restrictions in modern times, it is easy to lose sight of the States' traditional role in regulating immigration—and to overlook their sovereign prerogative to do so. I accept as a given that state regulation is excluded by the Constitution when (1) it has been prohibited by a valid federal law, or (2) it conflicts with federal regulation—when, for example, it admits those whom federal regulation would exclude, or excludes those whom federal regulation would admit.
*423 Possibility (1) need not be considered here: There is no federal law prohibiting the States’ sovereign power to exclude (assuming federal authority to enact such a law). The mere existence of federal action in the immigration area— and the so-called field pre-emption arising from that action, upon which the Court’s opinion so heavily relies, ante, at 401-403—cannot be regarded as such a prohibition. We are not talking here about a federal law prohibiting the States from regulating bubble-gum advertising, or even the construction of nuclear plants. We are talking about a federal law going to the core of state sovereignty: the power to exclude. Like elimination of the States’ other inherent sovereign power, immunity from suit, elimination of the States’ sovereign power to exclude requires that “Congress ... unequivocally expres[s] its intent to abrogate,” Seminole Tribe of Fla. v. Florida, 517 U. S. 44, 55 (1996) (internal quotation marks omitted). Implicit “field pre-emption” will not do.
Nor can federal power over illegal immigration be deemed exclusive because of what the Court’s opinion solicitously calls “foreign countries^] concern[s] about the status, safety, and security of their nationals in the United States,” ante, at 395. The Constitution gives all those on our shores the protections of the Bill of Rights—but just as those rights are not expanded for foreign nationals because of their countries’ views (some countries, for example, have recently discovered the death penalty to be barbaric), neither are the fundamental sovereign powers of the States abridged to accommodate foreign countries’ views. Even in its international relations, the Federal Government must live with the inconvenient fact that it is a Union of independent States, who have their own sovereign powers. This is not the first time it has found that a nuisance and a bother in the conduct of foreign policy. Four years ago, for example, the Government importuned us to interfere with thoroughly constitutional state judicial procedures in the criminal trial of foreign nationals because *424 the international community, and even an opinion of the International Court of Justice, disapproved them. See Medellín v. Texas, 552 U. S. 491 (2008). We rejected that request, as we should reject the Executive’s invocation of foreign-affairs considerations here. Though it may upset foreign powers—and even when the Federal Government desperately wants to avoid upsetting foreign powers—the States have the right to protect their borders against foreign nationals, just as they have the right to execute foreign nationals for murder.
What this case comes down to, then, is whether the Arizona law conflicts with federal immigration law—whether it excludes those whom federal law would admit, or admits those whom federal law would exclude. It does not purport to do so. It applies only to aliens who neither possess a privilege to be present under federal law nor have been removed pursuant to the Federal Government’s inherent authority. I proceed to consider the challenged provisions in detail.
§2(B)
“For any lawful stop, detention or arrest made by a law enforcement official ... in the enforcement of any other law or ordinance of a county, city or town or this state where reasonable suspicion exists that the person is an alien and is unlawfully present in the United States, a reasonable attempt shall be made, when practicable, to determine the immigration status of the person, except if the determination may hinder or obstruct an investigation. Any person who is arrested shall have the person’s immigration status determined before the person is released....” S. B. 1070, § 2(B), as amended, Ariz. Rev. Stat. Ann. § 11-1051(B) (West 2012).
The Government has conceded that “even before Section 2 was enacted, state and local officers had state-law authority to inquire of DHS [the Department of Homeland Security] *425 about a suspect’s unlawful status and otherwise cooperate with federal immigration officers.” Brief for United States 47 (citing App. 62, 82); see also Brief for United States 48-49. That concession, in my view, obviates the need for further inquiry. The Government’s conflict-pre-emption claim calls on us “to determine whether, under the circumstances of this particular case, [the State’s] law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.” Hines v. Davidowitz, 312 U. S. 52, 67 (1941) (emphasis added). It is impossible to make such a finding without a factual record concerning the manner in which Arizona is implementing these provisions—something the Government’s preenforcement challenge has pretermit-ted. “The fact that [a law] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid, since we have not recognized an ‘overbreadth’ doctrine outside the limited context of the First Amendment.” United States v. Salerno, 481 U. S. 739, 745 (1987). And on its face, § 2(B) merely tells state officials that they are authorized to do something that they were, by the Government’s concession, already authorized to do.
The Court therefore properly rejects the Government’s challenge, recognizing that, “[a]t this stage, without the benefit of a definitive interpretation from the state courts, it would be inappropriate to assume § 2(B) will be construed in a way that creates a conflict with federal law.” Ante, at 415. Before reaching that conclusion, however, the Court goes to great length to assuage fears that “state officers will be required to delay the release of some detainees for no reason other than to verify their immigration status.” Ante, at 413. Of course, any investigatory detention, including one under §2(B), may become an “unreasonable . . . seizur[e],” U. S. Const., Amdt. 4, if it lasts too long. See Illinois v. Caballes, 543 U. S. 405, 407 (2005). But that has nothing to do with this case, in which the Government claims that § 2(B) is preempted by federal immigration law, not that anyone’s Fourth *426 Amendment rights have been violated. And I know of no reason why a protracted detention that does not violate the Fourth Amendment would contradict or conflict with any federal immigration law.
§6
“A peace officer, without a warrant, may arrest a person if the officer has probable cause to believe . ..
[[Image here]]
[t]he person to be arrested has committed any public offense that makes the person removable from the United States.” S. B. 1070, § 6(A)(5), Ariz. Rev. Stat. Ann. § 13-3883(A)(5) (West Supp. 2011).
This provision of S. B. 1070 expands the statutory list of offenses for which an Arizona police officer may make an arrest without a warrant. See § 13-3883. If an officer has probable cause to believe that an individual is “removable” by reason of a public offense, then a warrant is not required to make an arrest. The Government’s primary contention is that § 6 is pre-empted by federal immigration law because it allows state officials to make arrests “without regard to federal priorities.” Brief for United States 53. The Court’s opinion focuses on limits that Congress has placed on federal officials’ authority to arrest removable aliens and the possibility that state officials will make arrests “to achieve [Arizona’s] own immigration policy” and “without any input from the Federal Government.” Ante, at 408.
Of course on this preenforcement record there is no reason to assume that Arizona officials will ignore federal immigration policy (unless it be the questionable policy of not wanting to identify illegal aliens who have committed offenses that make them removable). As Arizona points out, federal law expressly provides that state officers may “cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States,” 8 U. S. C. § 1357(g)(10)(B); and “cooperation]” requires neither identical efforts nor prior federal ap *427 proval. It is consistent with the Arizona statute, and with the “cooperative]” system that Congress has created, for state officials to arrest a removable alien, contact federal immigration authorities, and follow their lead on what to do next. And it is an assault on logic to say that identifying a removable alien and holding him for federal determination whether he should be removed “violates the principle that the removal process is entrusted to the discretion of the Federal Government,” ante, at 409. The State’s detention does not represent commencement of the removal process unless the Federal Government makes it so.
But that is not the most important point.. The most important point is that, as we have discussed, Arizona is entitled to have “its own immigration policy”—including a more rigorous enforcement policy—so long as that does not conflict with federal law. The Court says, as though the point is utterly dispositive, that “it is not a crime for a removable alien to remain present in the United States,” ante, at 407. It is not a federal crime, to be sure. But there is no reason Arizona cannot make it a state crime for a removable alien (or any illegal alien, for that matter) to remain present in Arizona.
The Court quotes § 1226(a), which provides that, “[o]n a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States.” Section 1357(a)(2) also provides that a federal immigration official “shall have power without warrant... to arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any [federal immigration] law or regulation and is likely to escape before a warrant can be obtained for his arrest.” But statutory limitations upon the actions of federal officers in enforcing the United States’ power to protect its borders do not on their face apply to the actions of state officers in enforcing the State’s power to protect its borders. There is no more reason to read these provisions as implying that state offi *428 cials are subject to similar limitations than there is to read them as implying that only federal officials may arrest removable aliens. And in any event neither implication would constitute the sort of clear elimination of the States’ sovereign power that our cases demand.
The Court raises concerns about “unnecessary harassment of some aliens . . . who federal officials determine should not be removed.” Ante, at 408. But we have no license to assume, without any support in the record, that Arizona officials would use their arrest authority under §6 to harass anyone. And it makes no difference that federal officials might “determine [that some unlawfully present aliens] should not be removed,” ibid. They may well determine not to remove from the United States aliens who have no right to be here; but unless and until these aliens have been given the right to remain, Arizona is entitled to arrest them and at least bring them to federal officials’ attention, which is all that §6 necessarily entails. (In my view, the State can go further than this, and punish them for their unlawful entry and presence in Arizona.)
The Government complains that state officials might not heed “federal priorities.” Indeed they might not, particularly if those priorities include willful blindness or deliberate inattention to the presence of removable aliens in Arizona. The State’s whole complaint—the reason this law was passed and this case has arisen—is that the citizens of Arizona believe federal priorities are too lax. The State has the sovereign power to protect its borders more rigorously if it wishes, absent any valid federal prohibition. The Executive’s policy choice of lax federal enforcement does not constitute such a prohibition.
§3
“In addition to any violation of federal law, a person is guilty of willful failure to complete or carry an alien registration document if the person is in violation of 8 *429 [U.S.C.] § 1304(e) or 1306(a).” S. B. 1070, §3(A), as amended, Ariz. Rev. Stat. Ann. § 13-1509(A).
It is beyond question that a State may make violation of federal law a violation of state law as well. We have held that to be so even when the interest protected is a distinctively federal interest, such as protection of the dignity of the national flag, see Halter v. Nebraska, 205 U. S. 34 (1907), or protection of the Federal Government’s ability to recruit soldiers, Gilbert v. Minnesota, 254 U. S. 325 (1920). “[T]he State is not inhibited from making the national purposes its own purposes to the extent of exerting its police power to prevent its own citizens from obstructing the accomplishment of such purposes.” Id., at 331 (internal quotation marks omitted). Much more is that so when, as here, the State is protecting its own interest, the integrity of its borders. And we have said that explicitly with regard to illegal immigration: “Despite the exclusive federal control of this Nation’s borders, we cannot conclude that the States are without any power to deter the influx of persons entering the United States against federal law, and whose numbers might have a discernible impact on traditional state concerns.” Plyler v. Doe, 457 U. S. 202, 228, n. 23 (1982).
The Court’s opinion relies upon Hines v. Davidowitz, 312 U. S. 52. Ante, at 401. But that case did not, as the Court believes, establish a “field pre-emption” that implicitly eliminates the States’ sovereign power to exclude those whom federal law excludes. It held that the States are not permitted to establish “additional or auxiliary” registration requirements for aliens. 312 U. S., at 66-67. But § 3 does not establish additional or auxiliary registration requirements. It merely makes a violation of state law the very same failure to register and failure to carry evidence of registration that are violations of federal law. Hines does not prevent the State from relying on the federal registration system as “an available aid in the enforcement of a number of statutes of the state applicable to aliens whose constitutional validity *430 has not been questioned.” Id., at 75-76 (Stone, J., dissenting). One such statute is Arizona’s law forbidding illegal aliens to collect unemployment benefits, Ariz. Rev. Stat. Ann. § 23-781(B) (West 2012). To enforce that and other laws that validly turn on alien status, Arizona has, in Justice Stone’s words, an interest in knowing “the number and whereabouts of aliens within the state” and in having “a means of their identification,” 312 U. S., at 75. And it can punish the aliens’ failure to comply with the provisions of federal law that make that knowledge and identification possible.
In some areas of uniquely federal concern—e. g., fraud in a federal administrative process (Buckman Co. v. Plaintiffs’ Legal Comm., 531 U. S. 341 (2001)) or perjury in violation of a federally required oath (In re Loney, 134 U. S. 372 (1890))— this Court has held that a State has no legitimate interest in enforcing a federal scheme. But the federal alien registration system is certainly not of uniquely federal interest. States, private entities, and individuals rely on the federal registration system (including the E-Verify program) on a regular basis. Arizona’s legitimate interest in protecting (among other things) its unemployment-benefits system is an entirely adequate basis for making the violation of federal registration and carry requirements a violation of state law as well.
The Court points out, however, ante, at 402-403, that in some respects the state law exceeds the punishments prescribed by federal law: It rules out probation and pardon, which are available under federal law. The answer is that it makes no difference. Illegal immigrants who violate § 3 violate Arizona law. It is one thing to say that the Supremacy Clause prevents Arizona law from excluding those whom federal law admits. It is quite something else to say that a violation of Arizona law cannot be punished more severely than a violation of federal law. Especially where (as here) the State is defending its own sovereign interests, there is no precedent for such a limitation. The sale of illegal drugs, for example, ordinarily violates state law as well as federal *431 law, and no one thinks that the state penalties cannot exceed the federal. As I have discussed, moreover, “field preemption” cannot establish a prohibition of additional state penalties in the area of immigration.
Finally, the Government also suggests that §3 poses an obstacle to the administration of federal immigration law, see Brief for United States 31-33, but “there is no conflict in terms, and no possibility of such conflict, [if] the state statute makes federal law its own,” California v. Zook, 336 U. S. 725, 735 (1949).
It holds no fear for me, as it does for the Court, that “[w]ere §3 to come into force, the State would have the power to bring criminal charges against individuals for violating a federal law even in circumstances where federal officials in charge of the comprehensive scheme determine that prosecution would frustrate federal policies.” Ante, at 402. That seems to me entirely appropriate when the State uses the federal law (as it must) as the criterion for the exercise of its own power, and the implementation of its own policies of excluding those who do not belong there. What I do fear—and what Arizona and the States that support it fear— is that “federal policies” of nonenforcement will leave the States helpless before those evil effects of illegal immigration that the Court’s opinion dutifully recites in its prologue {ante, at 397-398) but leaves unremedied in its disposition.
§5(C)
“It is unlawful for a person who is unlawfully present in the United States and who is an unauthorized alien to knowingly apply for work, solicit work in a public place or perform work as an employee or independent contractor in this state.” S. B. 1070, § 5(C), as amended, Ariz. Rev. Stat. Ann. § 13-2928(0 (West Supp. 2011).
Here, the Court rightly starts with De Canas v. Bica, 424 U. S. 351 (1976), which involved a California law providing that “ ‘[n]o employer shall knowingly employ an alien who is not entitled to lawful residence in the United States if *432 such employment would have an adverse effect on lawful resident workers.’” Id., at 352 (quoting Cal. Lab. Code Ann. § 2805(a)). This Court concluded that the California law was not pre-empted, as Congress had neither occupied the field of “regulation of employment of illegal aliens” nor expressed “the clear and manifest purpose” of displacing such state regulation. 424 U. S., at 356-357 (internal quotation marks omitted). Thus, at the time De Canas was decided, §5(C) would have been indubitably lawful.
The only relevant change is that Congress has since enacted its own restrictions on employers who hire illegal aliens, 8 U. S. C. § 1324a, in legislation that also includes some civil (but no criminal) penalties on illegal aliens who accept unlawful employment. The Court concludes from this (reasonably enough) “that Congress made a deliberate choice not to impose criminal penalties on aliens who seek, or engage in, unauthorized employment,” ante, at 405. But that is not the same as a deliberate choice to prohibit the States from imposing criminal penalties. Congress’s intent with regard to exclusion of state law need not be guessed at, but is found in the law’s express pre-emption provision, which excludes “any State or local law imposing civil or criminal sanctions (other than through licensing and similar laws) upon those who employ, or recruit or refer for a fee for employment, unauthorized aliens,” §1324a(h)(2) (emphasis added). Common sense, reflected in the canon expressio unius est exclusio alterius, suggests that the specification of pre-emption for laws punishing “those who employ” implies the lack of pre-emption for other laws, including laws punishing “those who seek or accept employment.”
The Court has no credible response to this. It quotes our jurisprudence to the effect that an “express pre-emption provisio[n] does not bar the ordinary working of conflict preemption principles.” Ante, at 406 (quoting Geier v. American Honda Motor Co., 529 U. S. 861, 869 (2000) (internal quotation marks omitted)). True enough—conflict pre-emption *433 principles. It then goes on to say that since “Congress decided it would be inappropriate to impose criminal penalties on aliens who seek or engage in unauthorized employment,” “[i]t follows that a state law to the contrary is an obstacle to the regulatory system Congress chose.” Ante, at 406. For “ ‘[wjhere a comprehensive federal scheme intentionally leaves a portion of the regulated field without controls, then the pre-emptive inference can be drawn.’” Ante, at 406-407 (quoting Puerto Rico Dept. of Consumer Affairs v. ISLA Petroleum Corp., 485 U. S. 495, 503 (1988)). All that is a classic description not of conflict pre-emption but oí field pre-emption, which (concededly) does not occur beyond the terms of an express pre-emption provision.
The Court concludes that § 5(C) “would interfere with the careful balance struck by Congress,” ante, at 406 (another field pre-emption notion, by the way), but that is easy to say and impossible to demonstrate. The Court relies primarily on the fact that “[proposals to make unauthorized work a criminal offense were debated and discussed during the long process of drafting [the Immigration Reform and Control Act of 1986 (IRCA)],” “[b]ut Congress rejected them.” Ante, at 405. There is no more reason to believe that this rejection was expressive of a desire that there be no sanctions on employees, than expressive of a desire that such sanctions be left to the States. To tell the truth, it was most likely expressive of what inaction ordinarily expresses: nothing at all. It is a “naive assumption that the failure of a bill to make it out of committee, or to be adopted when reported to the floor, is the same as a congressional rejection of what the bill contained.” Crosby v. National Foreign Trade Council, 530 U. S. 363, 389 (2000) (Scalia, J., concurring in judgment) (internal quotation marks and brackets omitted).
* * *
The brief for the Government in this case asserted that “the Executive Branch’s ability to exercise discretion and set *434 priorities is particularly important because of the need to allocate scarce enforcement resources wisely.” Brief for United States 21. Of course there is no reason why the Federal Executive’s need to allocate its scarce enforcement resources should disable Arizona from devoting its resources to illegal immigration in Arizona that in its view the Federal Executive has given short shrift. Despite Congress’s prescription that “the immigration laws of the United States should be enforced vigorously and uniformly,” IRCA § 115, 100 Stat. 3384, Arizona asserts without contradiction and with supporting citations:
“[I]n the last decade federal enforcement efforts have focused primarily on areas in California and Texas, leaving Arizona’s border to suffer from comparative neglect. The result has been the funneling of an increasing tide of illegal border crossings into Arizona. Indeed, over the past decade, over a third of the Nation’s illegal border crossings occurred in Arizona.” Brief for Petitioners 2-3 (footnote omitted).
Must Arizona’s ability to protect its borders yield to the reality that Congress has provided inadequate funding for federal enforcement—or, even worse, to the Executive’s unwise targeting of that funding?
But leave that aside. It has become clear that federal enforcement priorities—in the sense of priorities based on the need to allocate “scarce enforcement resources”—is not the problem here. After this case was argued and while it was under consideration, the Secretary of Homeland Security announced a program exempting from immigration enforcement some 1.4 million illegal immigrants under the age of 30.[4] If an individual unlawfully present in the United States
“• came to the United States under the age of sixteen;
“• has continuously resided in the United States for at least five years .. .;
*435 “• is currently in school, has graduated from high school, has obtained a general education development certificate, or is an honorably discharged veteran . . . ;
“• has not been convicted of a [serious crime]; and
“• is not above the age of thirty,”[5]
then U. S. immigration officials have been directed to “defe[r] action” against such individual “for a period of two years, subject to renewal.”[6] The husbanding of scarce enforcement resources can hardly be the justification for this, since the considerable administrative cost of conducting as many as 1.4 million background checks, and ruling on the biennial requests for dispensation that the nonenforcement program envisions, will necessarily be deducted from immigration enforcement. The President said at a news conference that the new program is “the right thing to do” in light of Congress’s failure to pass the administration’s proposed revision of the Immigration Act.[7] Perhaps it is, though Arizona may not think so. But to say, as the Court does, that Arizona contradicts federal law by enforcing applications of the Immigration Act that the President declines to enforce boggles the mind.
The Court opinion’s looming specter of inutterable horror—“[i]f § 3 of the Arizona statute were valid, every State could give itself independent authority to prosecute federal registration violations,” ante, at 402—seems to me not so horrible and even less looming. But there has come to pass, and is with us today, the specter that Arizona and the States *436 that support it predicted: a Federal Government that does not want to enforce the immigration laws as written, and leaves the States’ borders unprotected against immigrants whom those laws would exclude. So the issue is a stark one. Are the sovereign States at the mercy of the Federal Executive’s refusal to enforce the Nation’s immigration laws?
A good way of answering that question is to ask: Would the States conceivably have entered into the Union if the Constitution itself contained the Court’s holding? Today’s judgment surely fails that test. At the Constitutional Convention of 1787, the delegates contended with “the jealousy of the states with regard to their sovereignty.” 1 Records of the Federal Convention 19 (M. Farrand ed. 1911) (statement of Edmund Randolph). Through ratification of the fundamental charter that the Convention produced, the States ceded much of their sovereignty to the Federal Government. But much of it remained jealously guarded—as reflected in the innumerable proposals that never left Independence Hall. Now, imagine a provision—perhaps inserted right after Art. I, § 8, cl. 4, the Naturalization Clause—which included among the enumerated powers of Congress “To establish Limitations upon Immigration that will be exclusive and that will be enforced only to the extent the President deems appropriate.” The delegates to the Grand Convention would have rushed to the exits.
As is often the case, discussion of the dry legalities that are the proper object of our attention suppresses the very human realities that gave rise to the suit. Arizona bears the brunt of the country’s illegal immigration problem. Its citizens feel themselves under siege by large numbers of illegal immigrants who invade their property, strain their social services, and even place their lives in jeopardy. Federal officials have been unable to remedy the problem, and indeed have recently shown that they are unwilling to do so. Thousands of Arizona’s estimated 400,000 illegal immigrants—including not just children but men and women under 30—are *437 now assured immunity from enforcement, and will be able to compete openly with Arizona citizens for employment.
Arizona has moved to protect its sovereignty—not in contradiction of federal law, but in complete compliance with it. The laws under challenge here do not extend or revise federal immigration restrictions, but merely enforce those restrictions more effectively. If securing its territory in this fashion is not within the power of Arizona, we should cease referring to it as a sovereign State. I dissent.

 Many of the 17th-, 18th-, and 19th-century commentators maintained that States should exclude foreigners only for good reason. Pufendorf, for example, maintained that States are generally expected to grant “permanent settlement to strangers who have been driven from their former home,” though acknowledging that, when faced with the prospect of mass immigration, “every state may decide after its own custom what privilege should be granted in such a situation.” 2 Of the Law of Nature and Na *418 tions, bk. Ill, ch. III, § 10, p. 366 (C. Oldfather & W. Oldfather eds. 1934). See generally Cleveland, Powers Inherent in Sovereignty: Indians, Aliens, Territories, and the Nineteenth Century Origins of Plenary Power Over Foreign Affairs, 81 Texas L. Rev. 1, 83-87 (2002). But the authority to exclude was universally accepted as inherent in sovereignty, whatever prudential limitations there might be on its exercise.

 E. g., Va. Code, Tit. 54, ch. 198, § 39 (1849) (“If a master of a vessel or other person, knowingly, import or bring into this state, from any place out of the United States, any person convicted of crime ... he shall be confined in jail for three months, and be fined one hundred dollars”).

 There were two Alien Acts, one of which dealt only with enemy aliens. An Act respecting Alien Enemies, ch. 66, 1 Stat. 577.

 Preston & Cushman, Obama To Permit Young Migrants To Remain in U. S., N. Y. Times, June 16, 2012, pp. A1, A16.

 Memorandum from Janet Napolitano, Secretary of Homeland Security, to David V. Aguilar, Acting Commissioner, U. S. Customs and Border Protection; Alejandro Mayorkas, Director, U. S. Citizenship and Immigration Services; and John Morton, Director, U. S. Immigration and Customs Enforcement, p. 1 (June 15, 2012), online at http://www.dhs.gov (all Internet materials as visited June 22, 2012, and available in Clerk of Court’s case file).

 Id., at 2.

 Remarks by the President on Immigration (June 15, 2012), online at http://www.whitehouse.gov.